Leo and Loyce LILLY,
Plaintiffs-Appellants,

v.

The STATE TEACHERS RETIREMENT SYSTEM OF OHIO PENSION FUND and Lehman Brothers Incorporated, Defendants-Appellees.

No. 1150, Docket 79–7217.

United States Court of Appeals,
Second Circuit.

Argued June 4, 1979.

Decided Oct. 5, 1979.

Ronald Litowitz, Kreindler & Kreindler, New York City (Edward A. Grossman, New York City, of counsel), for plaintiffs-appellants.

James J. Hagan, Simpson, Thacher & Bartlett, New York City (Nancy F. McKenna, New York City, of counsel), for defendant-appellee Lehman Bros. Inc.

Russell A. Kelm, Schwartz, Remsen, Shapiro & Kelm, Columbus, Ohio (Nelson E. Genshaft, Columbus, Ohio, of counsel), for defendant-appellee The State Teachers Retirement System of Ohio Pension Fund.

**56**

Before OAKES and MESKILL, Circuit Judges, and SIFTON, District Judge.*

SIFTON, District Judge:

This appeal arises from allegations that a real estate investment trust, or REIT, with approximately $400,000,000 in assets, known as Guardian Mortgage Investors, or GMI, on the eve of the issuance of its annual audit results in the spring of 1974, disclosed to one of its principal financial advisors, Lehman Brothers Incorporated, that the REIT's "problem loans" had increased in the three months since its last public statement on the subject from $7,000,000 to $16,000,000 or $18,000,000. This inside information, it is alleged, was passed on by the brokerage firm to The State Teachers Retirement System of Ohio Pension Fund, another Lehman Brothers' client, which thereafter sold 80,000 shares of the REIT's stock to plaintiffs and the class they represent by means of a secondary offering, managed by Lehman Brothers, without disclosure of the inside information to the purchasers. Nine days after the secondary offering, the REIT made public information that it was substantially increasing its loss reserves and that its dividends would be substantially lower than those paid the preceding year. As a result, the stock fell precipitously and plaintiffs suffered an immediate loss on their investment.

■ At the conclusion of plaintiffs' case the court below dismissed plaintiffs' complaint, which alleged violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, thereunder, and granted motions for directed verdicts in favor of Lehman Brothers and its pension fund client. The court concluded that the jury could not rationally find that the inside information said to have been "tipped" by the REIT to Lehman Brothers and by Lehman Brothers to the pension fund was material, or that Lehman Brothers and its client acted with an intent to defraud or to deceive in selling the 80,000 shares of the REIT's stock to the uninformed public. Since our examination of the record reveals evidence on the basis of which a jury could have reasonably concluded that the "tip" was material and that the sale by the "tippees" was accomplished with knowledge of the tip's materiality and with fraudulent and deceptive intent to take advantage of the public's ignorance, we reverse in order that the issues raised by plaintiffs' complaint may be resolved by jury.

The economic situation in the context of which this insider "tip" is said to have occurred was characterized, according to the evidence below, by rising interest rates and materials shortages. REITs, which one witness testified make money on the spread between the interest rates at which they borrow from banks and that at which they lend to real estate developers and builders, were generally perceived to be suffering as a result of increases in the prime rate from around 6% in March 1973 to around 10% in March of the following year. Real estate developers who might reasonably be expected to resist increases in borrowing costs which exceeded their expectations appeared particularly resistant to proposals by REITs to pass on to them the higher cost of money as materials shortages led to escalating costs of other supplies. These factors affecting the real estate market in general and the market for REIT stocks in particular were chronicled in detail in the financial press at the time, articles from which were made part of the record below. In the fall of 1973 and spring of 1974 these factors were generally perceived to have resulted in the well publicized failure of one prominent real estate developer and thereafter, of a prominent REIT.[1]

---

* Of the Eastern District of New York, sitting by designation.

1. An article in the *Wall Street Journal* for January 21, 1974, entitled, "REITs Face Shake-out as Investments Sour, Cash Sources Dry Up," reads in part as follows:

"The crux of the problem is that a growing number of the trusts' construction and mortgage loans are coming into default as builder-developers are hurt by past overbuilding, inflation, high interest costs and materials shortages."

In this context the expression, "problem loans," developed, according to the evidence below, as an expression of somewhat uncertain content which figured prominently in public and private evaluations of the industry and of REIT stocks. According to one witness the expression referred to a spectrum of situations running from loans to builders and developers on which the REIT had stopped accruing interest because of default in payment, to loans in default of which the REIT had taken possession of the underlying real estate or development securing the loan.

The uncertainty as to the situation referred to by the expression, "problem loans," was compounded by well publicized debates within the accounting profession as to the appropriate method of treating problem loans for purposes of auditing and reporting on the financial condition of REITs. As an example, one witness below testified that according to one accounting philosophy the REIT, which upon default protected itself by foreclosing on its real estate security, should be treated as itself a developer and its actual and anticipated losses calculated according to auditing procedures and accounting standards appropriate to that business. According to another philosophy, however, the REIT in such a situation should continue to be regarded as simply a real estate investment vehicle, fully protected against loss on its investment as long as it appeared that on the ultimate realization of the development's expectations, the REIT would suffer no loss on the principal of its loan.

The reason for this lively investor interest in the subject of problem loans and for the coverage in the financial press of differences within the accounting profession in dealing with them was, the jury could have concluded, because of the uncertainty in the minds of the accounting profession as to the appropriate relationship between problem loans and loss reserves and because of the key role played by loss reserves in the evaluation of REIT stocks as investments. While the relationship of an REIT's problem loans to its loss reserves was uncertain and subject to considerable debate, changes in loss reserves were related in a devastatingly simple, almost mechanical way to the price of the REIT's stock. The explanation of this relationship lay in the structure and operation of REITs as dictated by the Internal Revenue Code.

As witnesses testified below, any increase in an REIT's loss reserves could only be established by a corresponding charge to current earnings; REIT earnings were, in turn, related to the REIT's dividends by the requirements of the Internal Revenue Code. In order to qualify as an REIT under the Code, thereby avoiding treatment of its revenues as income for tax purposes, the investment trust was required, *inter alia*, to distribute at least 90% of its otherwise taxable income as dividends. 26 U.S.C. §§ 856–58 (1970) (amended 1976). Moreover, in order to avoid second guessing by the Internal Revenue Service with regard to revenues properly included on its calculation of otherwise taxable income, most

An article in the *Wall Street Journal* for January 23, 1974, reported the cancellation of a stock offering by a major REIT. An article from the same paper for March 1, 1974, reported a major addition to the loan loss reserve for another REIT. On March 14, 1974, under the headline, "Audits Become Painful for Some REITs That Focus on Mortgage, Building Loans," the *Wall Street Journal* reported:

"Year-end audits are turning into an expensive nightmare for some real estate investment trusts that specialize in construction and mortgage loans.

"A sudden surge in problem loans in 1973's second half, tied to sluggishness and some collapses in the construction industry, brought down some REITs earnings and presented other problems. Auditors doubled their efforts. *Some asked for independent appraisals on certain properties . . .* Auditors concede they have little expertise in evaluating the likelihood that a given construction job will default on payment or fall into foreclosure. That is one reason they are asking for the outside appraisals. . . . At this point most trusts with calendar years, and particularly those with substantial problem loans, haven't yet reported year-end results."

On March 18, 1974, two days before the sale here at issue, the *Wall Street Journal* reported the filing of a Chapter XI proceeding by a prominent REIT.

REITs, including GMI, made it a practice to distribute dividends equal to their annual revenues. Finally, because REIT stocks were looked to in the investment community primarily for income rather than for gains resulting from capital accretion, the prices of REIT stocks were exceptionally sensitive to changes in dividend levels.

Given this structural sensitivity of the price of an REIT's stock to the level of loss reserves deemed by the REIT and its accountants to be appropriate in the light of its problem loans, it is understandable why at the particular period of time here at issue extraordinary attention was focused by investors on the uncertain subject of problem loans. As one witness testified:

> "Problem loans is a designation that began around that time. But at the time beginning around then and in subsequent months, problem loans became the heavy focus of everyone in the securities industry in analyzing the financial condition of an REIT, and problem loans became a normal part of any conversation that you have."[2] (J.A. 343.)

In this context, it seems clear that there was substantial basis in the record for submitting to the jury the question whether information concerning the level and the trend pursued by GMI's problem loans was the kind of information which a reasonable investor would want to know before deciding whether to purchase the REIT's stock,[3] and, in particular, whether information, that the level of problem loans as calculated by management had increased from $7,000,-000 to $16,000,000 or $18,000,000 over a three-month period, would be regarded by a reasonable investor "as having significantly altered the 'total mix' of information . . available" concerning the REIT's financial condition. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

Indeed, the manner in which the information was regarded by those privy to it and the importance attached to the information by the recipients after the "tip" could be found to have been given, *cf. S.E.C. v. Bausch & Lomb, Inc.*, 565 F.2d 8, 18 (2d Cir. 1977), were entirely consistent with a conclusion that the information was material information. The President of GMI, whose deposition was read at trial, himself treated the information as material inside information, testifying that he had declined to furnish a Lehman Brothers' research analyst with the information because it was not publicly available.[4] Almost immediately following the receipt by Lehman Brothers of the information concerning the level of the REIT's problem loans, the Lehman Brothers' analyst receiving the information prepared a "Research Wire" labeled, "Not for distribution outside of Lehman Brothers," devoted exclusively to reporting the information received and to an analysis of its significance in terms of the REIT's loss reserves, earnings and anticipated dividend levels. A second contact by the research analyst with another representative of GMI a week later, which, the jury could have

---

**2.** One witness from the REIT testified that all of the analysts calling GMI at that particular time inquired about the level of problem loans (Joint Appendix [J.A.] 273). The witness testified that to all questions "our response during that period of time was the fact that we were not giving a response." (J.A. 271.)

**3.** As grim as were the problems faced by "some REITs," according to the financial press, the identification of the particular REITs, suffering from these problems was still open to question and, the jury could have inferred based on the sales here at issue, continued to be a subject of investor interest.

**4.** The President of the REIT testified:

> "Q: Do you recall what you told Mr. Callaghan about the answer to his inquiries about the level of the problem loans?
> "A: Well, any specific data was declined in terms of what was not already released and in the hands of the public.
> "If it was there, we would certainly be free to discuss it. But at that point, the last communique that anyone in the public markets would have received would have been the December press release, I assume . . . . .
> "And on the basis of that and prior releases to that, or quarterly statements, we could be free to talk. But certainly anything subsequent to that, our reply was that none of the operations nor any of the other figures could be available until the completion of the audit." (J.A. 344–45.)

found, produced additional information concerning the REIT's problem loans, was recorded by the analyst in an "REIT contact report." According to the testimony, this report, which on its face indicated that GMI management was the source of the information discussed, was circulated to customers of Lehman Brothers including, the jury could infer, the defendant pension fund. Again, the report explicitly analyzed the effect of the information with regard to problem loans on the REIT's anticipated earnings and dividend levels noting that "*audited* earnings for the fiscal year ended February 28, 1974 are expected to be reported between 3/22/74 and 3/27/74." (Emphasis in original.)

Despite the obvious importance attributed to the information concerning the increase in GMI's problem loans by both GMI and Lehman Brothers, the court below concluded that the jury could not rationally find that the information was material. A principal basis for this conclusion appears to have been the fact that, according to Lehman Brothers' memoranda introduced during the plaintiffs' case, it was the view, first expressed by the brokerage firm as that of the brokerage firm itself arrived at after discussions with management and later simply as that of management, that no loss of principal was anticipated on any of the REIT's problem loans. Given this conclusion, the court below reasoned, no increase in loss reserve to guard against loss of principal was necessary and no decrease in dividends could be foreseen. Since no substantial change in the dividend level was anticipated, the inside information was not "reasonably certain to have a substantial effect on the market of price of the security," a test of materiality taken by the court below from *S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir. 1968) (en banc), *cert. denied sub nom. Coates v. S.E.C.*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), and the "anticipated magnitude of the event in the light of the totality of the company activity was, at best, speculative," a test taken from *Harkavy v. Apparel Industries, Inc.*, 571 F.2d 737, 741–42 (2d Cir. 1978). Accordingly, the court below concluded, the information alleged to have been obtained by Lehman Brothers from the REIT was not the type of information in which a reasonable investor would be interested.

The error in this reasoning is that it assumes a clear-cut and well-defined relationship between problem loans and loss reserves which the jury could have concluded on the evidence below did not exist in the minds of investors at the time here at issue. Given the evidence introduced below including articles from the financial press detailing the substantial uncertainty both among laymen and professional accountants concerning the definition of problem loans, their treatment for accounting purposes in general, and their relationship to loss reserves in particular,[5] it was error for the court to conclude as a matter of law that investor interest in the increase in GMI's problem loans would have disappeared given a simple assurance from management that no principal loss was anticipated on

---

**5.** One witness, a former Lehman Brothers' employee, testified:

> "Q. Now, back in March of 1974, did analysts like yourself who followed REITs recognize a relationship between problem loans and the loan loss reserve?
> "A. Yes.
> "Q. Can you tell us as best you can recall what that relationship was?
> "A. No, because at the time there was no consistent pattern in developing loan loss reserves within the industry." (J.A. 502.)
>
>      *   *   *   *   *   *
>
> " . . . there was no formula, as best I can remember, in determining this. It was more subjective than objective."

> "Q. Back in March of 1974, was it your understanding that if problem loans would go up the loan loss reserve would go up?"
> "A. Yes." (J.A. 505.)

The witness hardly clarified the situation by testifying on cross-examination in response to questions by an attorney for Lehman Brothers as follows:

> "Q. Let me try it this way, Mr. Callaghan: If a loan, if a party anticipates no loss of principal on a loan, in your opinion would that affect the allowance for loan loss reserve?
> "A. Under the theory of loss reserving, it would not. Under the practice of loss reserving, it would." (J.A. 529–30.)

any particular problem loan.[6] That information, the jury could have found, did not eliminate a risk the magnitude of which could not have been predicted with any reasonable degree of certainty that the increase in the REIT's problem loans would significantly affect the REIT's financial condition. The reasonable investor has an interest in knowing not only information which will, with reasonable certainty, affect the price of the stock he contemplates buying or selling. He also has an interest in obtaining information which renders it impossible to assess the value of his investment with any reasonable certainty and turns an otherwise reasonable investment into a speculative one.

A further difficulty presented by the trial court's reasoning is that it analyzes the significance of the information alleged to have been tipped not from the standpoint of the reasonable investor at all, but rather from the standpoint of the tippee, focusing on the significance attributed to the information by its recipient. There is no basis for such an approach in our cases. On the contrary, the standard of materiality requires that efforts be made to place the investor in the same position as the tippee with regard to available information in order that the investor may, if so inclined, make inquiry and satisfy himself as to whether the investment he is contemplating should be made or not.[7] While in many cases the private evaluation of inside information by a tippee will coincide with the significance attributed to the information by a reasonable investor, it is precisely in a situation in which the public reaction to release of the information cannot be predicted with any reasonable degree of certainty that the insider's personal evaluation of the information becomes largely irrelevant to an assessment of its materiality.

Evidence as to Lehman Brothers' own efforts to evaluate the significance of the information it received and to quantify its effect on GMI's earnings and dividends does, however, have obvious, although not dispositive relevance to the issue of its intent in urging the sale of GMI stocks by its pension fund client. It remains, therefore, to consider whether there existed evidence sufficient to warrant submission of the case to the jury on this issue. Our examination

---

6. Loss reserves, the jury could have concluded, serve not only the purpose of making provision against losses actually anticipated with regard to particular loans, but also the purpose of making provision against the increased risks of unanticipated losses resulting from changes in the volume or size of the business or, as in this case, changes in the number of loans in default. Thus, in the *Forbes Magazine* article, referred to in footnote 10 below, results of a survey of industry practices were set forth in which only 11% of the 84 REITs queried reported that they calculated the appropriate loss reserve on the basis of known losses. 41% based the calculation of the appropriate loss reserves on a percentage of net income. 24% were reported to have used a percentage of the investment portfolio. The article continues by stating:

"But, . . . little logic can be found for choosing any one of these approaches. There ought to be firm guidelines, we [the authors of the article] said. Again, we heard a litany of the difficulties involved. Since the industry is so young, there is little history to go by. What sense does it make to take a percentage of income when any number of variables can affect how much will be recovered? Normally, a trust can get all or most of its money out of a foreclosure, but what if it cannot? How can you reserve for a total loss on one loan in a portfolio of 16 or 17 mortgages?"

In this situation a substantial increase in an REIT's problem loans, which on its face substantially increased the risks of unanticipated losses, placed the REIT at the center of a lively debate within the accounting profession as to the appropriate loss reserve to be established. In the circumstances, the jury could well have concluded that the effect of the substantial increase in the REIT's problem loan was to make it impossible to assess with any reasonable degree of certainty how the accountants would report the REIT's financial condition.

7. On the evidence below there was at least a strong possibility that inquiry by a putative investor would have resulted in a conclusion that principal losses could be anticipated with regard to some of GMI's problem loans. Indeed, the audit team from Peat, Marwick, Mitchell & Co. engaged in preparation of the REIT's annual report arrived at that conclusion, precipitating a confrontation with management as to the appropriate loss reserve philosophy to be followed and loss reserve to be established which led to a sizeable increase in GMI's loss reserves and consequent decrease in dividends and fall in the price of its stock.

of the record reveals quite traditional bases from which the jury could have reasonably inferred an intent to deceive as an animating force behind the sale made by the pension fund on March 20, 1974—just two days prior to the earliest date on which Lehman Brothers anticipated release of the REIT's financial statements.

First, the President of the REIT, the Lehman Brothers' analyst principally responsible for the decision by the pension fund to sell the REIT's stock, and the officer of the pension fund who made the decision to sell, all denied that they had been party to a disclosure of information concerning an increase in the level of problem loans at the REIT prior to the sale. The testimony of the President of the REIT was that, while such information was undoubtedly of the type which should not be disclosed, he had not made any such disclosure (J.A. 344–45). This testimony, the jury could have found, was contradicted by internal Lehman Brothers' memoranda which recorded a contact by a Lehman Brothers' research analyst with the REIT's President and the report of the information by the same analyst as contemporaneous events.[8] The testimony of the Lehman Brothers' broker principally responsible for the sale of the stock was that he had not been aware of the level of the REIT's problem loans prior to March 29, 1979, after the sale here at issue had occurred (J.A. 626). This denial was also subject to question by the jury in the light of the internal Lehman Brothers' Research Wire entirely devoted to a discussion of GMI's increased problem loans circulated within Lehman Brothers at a time when the pension fund's sale of its holdings of GMI stock was under active consideration. The testimony by the pension fund officer responsible for deciding to make the sale of GMI was that he had never discussed the merits or demerits of a particular REIT stock with Lehman Brothers' representatives, but that all discussions

had dealt exclusively with "generalities about the REIT industry as a whole." (J.A. 115, 127). This testimony was subject to considerable question by the jury in the light of the description by another pension fund employee of two telephone calls between both pension fund representatives and two Lehman Brothers' research analysts on the eve of the sale during which the merits of the particular REIT stocks in the pension fund portfolio were discussed in what the jury could have inferred was some detail (J.A. 433, 449).

While the District Court apparently had issues of credibility such as these in mind in passing on defendants' motions for directed verdicts, it found no basis for permitting the jury to resolve these issues, apparently on the theory that the jury could not conclude that the defendants' state of mind was different than it was stated to be without violating the teaching of *Dyer v. MacDougall*, 201 F.2d 265 (2d Cir. 1952), that a plaintiff's case cannot rest simply on the disbelief of the plaintiff's witnesses. There are two grounds for rejecting this reasoning. First, lack of credibility was not the only basis on which to infer an intent to deceive or defraud in the evidence below. Secondly, the issue presented by this question of credibility was not as to what the witnesses would have said, if they testified truthfully—a piece of jury speculation condemned in *Dyer v. MacDougall, supra.* Rather, the jury was in a position to be asked to draw rational inferences as to the unstated reasons why the witnesses would not tell the truth under these circumstances: that the REIT's President, the Lehman Brothers' analyst, and the pension fund personnel all denied that the tip had occurred because of an awareness that, if the jury believed the disclosure occurred, the witnesses would be unable to withstand cross-examination and jury scrutiny of their motives and intentions.

8. A mimeographed form used by Lehman Brothers to record "Management Contacts" signed by the analyst beneath the statement, "On the basis of these discussions, no information of a material inside nature evolved, in my best judgment" refers to a contact with the President of GMI occurring on March 1, 1974. The Research Wire is also dated March 1, 1974, a Friday, with a parenthetical dateline "Released Monday Morning—March 4."

Beyond these arguably false exculpatory statements from which the jury could rationally infer an intent to deceive, other evidence existed in the record bearing on the defendants' state of mind. Plaintiffs presented evidence concerning Lehman Brothers' careful instruction and training of its analysts with respect to the receipt and use of material inside information. There was also evidence that the particular Lehman Brothers' analyst who, the jury could have found, received the tip had his attention focused on the question of whether the information received could be properly circulated since he was required to execute a Lehman Brothers' form stating that, although he had just had contact with a corporate insider, no material information had been received. With regard to the state of mind of the pension fund representatives, the evidence presented would have warranted a jury's finding that the decision to sell the GMI stock had been made despite advice by two other brokers that another REIT stock in the portfolio was more appropriate for sale first. While it might be a permissible inference that other arguments advanced by Lehman Brothers persuaded the pension fund to act contrary to the advice of the other other brokerage houses, it was also a permissible inference that the reason for the sale of the GMI stock was to take advantage of the inside information supplied by Lehman Brothers with regard to the undisclosed increase in problem loans by an immediate sale in advance of the imminently expected release of GMI's annual report. Circumstantial evidence concerning the speed and somewhat unusual mechanics by which the secondary offering was accomplished provided plaintiffs with a rational argument that there was, on the part of both Lehman Brothers and the pension fund, a desire for haste consistent with an intent to get the stock into the hands of the public before the release of the audit report in which the trend of the REIT's problem loans would be revealed. Evidence with regard to the nature of the relationship between Lehman Brothers and the REIT on the one hand, and between Lehman Brothers and the pension fund on the other, gave the plaintiffs some circumstantial support with regard to the motivations of the parties.

Countering these considerations was the evidence already noted on the basis of which the jury could have inferred that Lehman Brothers, after examining the information concerning the increase in GMI's problem loans, concluded that it had no significance. This information included not only the proof that the Lehman Brothers' analyst who received the information, after discussing the matter with management, recorded himself as satisfied that no principal loss was anticipated, but also evidence that Lehman Brothers worked out the increase to reserves, decrease in revenues and change in dividends which could be anticipated in the face of the increase in problem loans, and concluded that those reserves, earnings and dividends would show changes from those reported in the past which were not significant in light of the problems of the industry in general.[9] Defendants were certainly in a position to argue forcefully to a jury that, if they believed that the anticipated lower dividends levels, despite the increase in problem loans, were no different from what anyone would have anticipated at the time even without knowing the level of the REIT's problem loans, then defend-

**9.** Although no explanation of the calculation is apparent from the record, the Lehman Brothers analyst who, the jury could have found, received the tip concerning GMI's increased problem loans on March 1, 1974, reported in the internal Research Wire circulated on March 4, 1974:

"Because of the current level of problem loans, we are lowering our earnings estimate for the quarter ending February 28, 1974 to approximately $1.10, as compared with the November 1973 quarterly earnings of $1.14 and the $1.07 earned a year ago for the quarter ended 2/28/73. We expect this quarter's dividend to be about the same as last quarter's $1.08.

"The trust's loss reserve as of November 30, 1974 amounted to $1.4 million or 0.4% funded investments. It would not totally surprise us if the trust were to strengthen the reserve over the next few quarters and report earnings and dividends a little lower than our estimates."

ants should not be found to have had an intent to mislead anyone by selling to a public unaware of the increase in problem loans.

Nevertheless, rational answers to this contention could be inferred from the evidence and were deserving of evaluation by a jury. Given the well publicized debate concerning the conflicting methods of treating problem loans, Lehman Brothers' expressed confidence that no principal loss could be anticipated with regard to any particular loan did not rationally exclude the existence of an awareness on the part of Lehman Brothers that the effect of the increase in problem loans on the REIT's loss reserves and dividends could not be predicted with any certainty.[10] Nor, the jury could have found in the absence of some evidence as to what Lehman Brothers did to investigate the likelihood of principal loss, could Lehman Brothers be, to any reasonable degree, certain in the circumstances that others, including the REIT's auditors, would arrive at the same conclusion which it arrived at with regard to the likelihood of principal loss after review of the increase in problem loans. The evidence with regard to Lehman Brothers' calculations of the anticipated dividend level is more enigmatic. However, being enigmatic, it hardly dictated the conclusion that the only rational result which the jury could arrive at was that the defendants acted without intent to deceive. Taken together with defendant's denial that the information was, in fact, "tipped", it was a permissible inference that the defendant's interpretation on paper of

the adverse inside information received was recognized to be only a partial statement of the significance of the information leaving out of account what could not be accounted for with any reasonable certainty—namely, the public's and accounting profession's reaction to disclosure of the information. This interpretation of the record gains some support from consideration of the peculiarly ironic tone of the internal Lehman Brothers' memorandum in which Lehman Brothers' estimate as to future dividends is set forth for the first time. After discussing the size of the problem loans, the anticipated changes in earnings and dividends, and the size of the trust's loss reserve, the memorandum concludes:

> "It would not totally surprise us if the trust were to strengthen the reserves over the next few quarters and report earnings and dividends a little lower than our estimates."[11]

The significance of the issues raised by the evidence with regard to defendants' state of mind was for the jury to determine. The judgment dismissing plaintiffs' complaint and granting defendants' motions for directed verdicts is, accordingly, vacated, and the case is remanded for a new trial.

---

10. It is significant in this connection that the entire contents of a two-page article in the issue of *Forbes Magazine* dated March 15, 1974, entitled, "When is a Lemon a Lemon?" was, according to one witness, read over the telephone to the pension fund personnel responsible for deciding whether and when to sell the fund's portfolio of REITs during the course of a telephone discussion with Lehman Brothers' personnel of the advisability of selling the stocks (J.A. 622). As noted in note 6, *supra*, a substantial part of the article was devoted to differences within the accounting profession concerning the auditing and reporting standards appropriate in dealing with REIT problem loans and establishing loss reserves.

11. The writer's use of the word "little" in the quoted paragraph could well have been compared by the jury with his use of the word "slightly" in the letter to the S.E.C. in which he described the inside information received as follows:

> "They [GMI personnel] advised me that GMI's problem loans had increased slightly from the end of the prior quarter and that they are currently running about 4% of funded investments."

At no place in this letter to the S.E.C. was it indicated that the slight increase was from $7 million to $18 million.