**James and Elizabeth McCARTHY,**

v.

**C–COR ELECTRONICS, INC. and Richard E. Perry.**

No. 95–1911.

United States District Court, E.D. Pennsylvania.

Dec. 29, 1995.

Fred S. Longer, Arnold Levin, Levin, Fishbein, Sedran & Berman, Stuart H. Savett, Savett, Frutkin, Podell & Ryan, P.C., Philadelphia, PA, for plaintiffs.

Walter M. Einhorn, Jr., Alan J. Davis, Ballard, Spahr, Andrews and Ingersoll, Philadelphia, PA, for defendants.

*OPINION*

LOUIS H. POLLAK, District Judge.

Presently before the court is the defendants' motion to dismiss for failure to state a claim upon which relief can be granted. The defendants in this case are C–COR Electronics, Inc. ("C–COR"), a Pennsylvania corporation engaged in the design and manufacture of electronic equipment used in communications networks, and Richard E. Perry, its chief executive officer and the chairman of its board.[1] The plaintiffs, James and Elizabeth McCarthy, purchased shares in C–COR on March 9, 1995 (shares which they may still own; the complaint is not clear on this point). The complaint alleges that the defendants made false or misleading statements that artificially increased the price of C–COR's shares at the time of the McCarthys' purchase, and that they thereby violated the federal securities laws and committed the Pennsylvania common-law tort of misrepresentation. The complaint is framed as a class action, on behalf of all those who purchased shares during the period when C–COR's share price was allegedly inflated.

## I. *Background*

As is usual in ruling on a motion to dismiss, the following account of the facts of this case assumes that the facts as stated in the complaint are true.

On January 17, 1995, C–COR issued a press release ("the January press release") discussing the firm's past and present earnings. In summarizing the figures for the second quarter of the firm's 1995 fiscal year—which had ended on December 23, 1994—the press release noted that earnings per share had been almost double what they were for the previous year's second quarter. The release also discussed the firm's expansion plans, stating that "[t]he State College move went smoothly during the annual holiday shutdown, and the Reedsville facility is currently being equipped so deliveries can begin in late January. We are hiring and training employees for that location now."

---

1. The court will occasionally, for convenience, refer to this motion as having been made by C–COR, rather than by both C–COR and Perry. The defendants' motion to dismiss principally challenges the plaintiffs' claims against C–COR, and only seeks the dismissal of the claims against Perry as a corollary to the dismissal of those against C–COR.

Complaint, ¶ 20. The press release then went on to discuss the firm's projected revenues and earnings, stating: "Looking ahead, we expect strong revenues for the second half of the year, although in the third quarter, the earnings are expected to reflect the start-up costs for Reedsville. We anticipate a strong fourth quarter and continue to have a record backlog." Complaint, ¶ 21.

On February 6, 1995, C–COR filed a Form 10–Q with the Securities and Exchange Commission for its second quarter. The defendants stated in this filing (1) that expenses increased in the first six months of fiscal 1995 because of "efforts to ramp up C–COR's production capacity in fiscal 1995," (2) that "accounts receivable increased by $2,355,000 and inventories increased $5,339,000 over the first six months of fiscal year 1995," and (3) that inventory had increased "as a result of C–COR's ramp-up efforts to meet increased production demands as well as making 'strategic' investments in certain raw material parts which were forecast to be in short supply in the future." Complaint, ¶ 23.

From February 16 through February 23, 1995, the chief executive officer of C–COR, Richard E. Perry, sold between fifteen and twenty percent of his holdings in the firm, some 20,000 shares, at prices ranging from $26.50 and $28.50 a share. Complaint, ¶ 27. On March 9, 1995, the plaintiffs purchased 150 shares of C–COR common stock.[2] Then, on March 27, 1995, C–COR issued a press release ("the March press release") indicating that its revenues and earnings for the third quarter, which had ended on March 24, 1995 (but for which final figures were presumably not yet available), would be "lower

than previously expected,"[3] and that "growth in revenues and earnings would be down due to reduced shipments because of component shortages, extended test times, development delays and start-up costs at C–COR's two new manufacturing plants." Complaint, ¶ 28. The release also quoted Perry as stating that "our plants continue to face challenges in the production and testing areas." *Id.* At the close of the market on the day of the March press release, C–COR's stock had fallen $3.25 per share, to close at $19. Complaint, ¶ 29. On March 31, 1995, the plaintiffs filed this action.

The plaintiffs assert that the January press release and the February Form 10–Q contained false and misleading statements, and omitted material facts, because at the time that they were released the defendants "knew or recklessly disregarded the facts that C–COR was experiencing shortages in components, extended test times for products before they could be shipped, delays in development of products, and increased costs associated with its two new manufacturing plants" which would prevent C–COR from achieving the growth in revenues and earnings projected in these statements. Complaint, ¶ 26. (In other words, the plaintiffs allege that the defendants were aware of the substance of the March press release at the time of the January release and February filing.) The plaintiffs allege that, as a result of these misrepresentations, the price of C–COR's common stock was artificially inflated during the period between the two press releases. The plaintiffs assert that these misrepresentations violated section 10(b) of the Securities Exchange Act,[4] and Rule 10b–

---

**2.** The complaint does not state at what price this purchase was made, but the defendants have provided the court with a record of C–COR's stock prices for the relevant period, and this record states that C–COR's stock price varied from a low of $27 a share to a high of $27¾ a share on the day in question. Defendant's Reply Memorandum, exh. B. (The court will take judicial notice of C–COR's stock prices, as they are a matter of public record.)

**3.** This phrase of the press release is not cited word-for-word in the complaint, but the full press release is attached as Exhibit B to the defendant's motion to dismiss, and "a court may consider an undisputedly authentic document

that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir.1993).

**4.** This section makes it unlawful for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange

. . . .

(b) to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative device or

5.[5] They also make a claim against Perry directly as a "controlling person," under section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a).[6] They further allege that the defendants have committed the Pennsylvania common-law tort of negligent misrepresentation.

The complaint is framed as a class action. The asserted class is that group of people who purchased C–COR common stock on the open market between January 17, 1995 (the date of the January press release) and March 24 (the last day of C–COR's third quarter, and the working day immediately preceding the issuance of the March 27 press release), and who suffered damages thereby. In other words, the members of this asserted class are all those allegedly harmed by having bought stock during the period in which C–COR's stock price was allegedly artificially high as a result of the January press release and February Form 10–Q filing.

## II. *Existence of a Claim under § 10(b)*

### A. *Elements of a § 10(b) Claim*

■ The Third Circuit recently restated the elements of a claim of securities fraud under § 10(b) and Rule 10b–5:

> To state a claim under § 10(b) and Rule 10b–5, a private plaintiff must plead (1) a false representation of (2) a material (3) fact, (4) the defendant's knowledge of its falsity and his intention that the plaintiff rely on it, (5) the plaintiff's reasonable reliance on the representation, and (6) the plaintiff's resulting loss.

*Shapiro v. UJB Financial Corporation,* 964 F.2d 272, 280 (3rd Cir.), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). A prediction, like that in the January Press Release, is a statement of "soft information," and can therefore be actionable. *See In re Donald J. Trump Casino Securities Lit.,* 7 F.3d 357, 368 (3rd Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994); *Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 642 (3rd Cir.1989); *see also Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1094, 111 S.Ct. 2749, 2759, 115 L.Ed.2d 929 (1991) (finding that statements of "soft information" can be actionable). C–COR's motion to dismiss asserts, however, (1) that the predictions cited by the plaintiffs are not false or misleading, and (2) that, even if they are, they are not material.

### B. *Identification of a False or Misleading Statement*

Although the plaintiffs assert in their complaint that the February 10–Q filing was materially misleading, they have provided the court with no argument to that effect, and there is no obvious basis for such a claim. Accordingly, the plaintiffs' claim based upon that filing will be dismissed.

The plaintiffs' arguments focus instead on the January press release. The following is the relevant portion of that press release:

> Looking ahead, we expect strong revenues for the second half of the year, although in the third quarter, the earnings are expect-

---

deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (1988).

**5.** This rule provides that it is unlawful for any person

directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

**6.** This section provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (1988).

ed to reflect the start-up costs for Reeds-ville. We anticipate a strong fourth quarter and continue to have a record backlog.

C–COR argues that this statement could not be "false or misleading" because, first, it made no predictions about C–COR's third quarter, and, second, because whatever predictions it made turned out to be true. I will consider these arguments in turn.

### 1. Did the January Press Release Make a Prediction about C–COR's Third Quarter?

■ The press release's statement that revenues for the second half of the year are expected to be strong could conceivably be read either (1) as predicting good final results for the year's second half, or (2) as predicting a second half with strong revenues throughout, including strong revenues in both the third and fourth quarters. The plaintiffs contend that it is possible that a reasonable investor could arrive at the second reading of this statement. I agree that it is possible—not probable, perhaps, but possible—that a reasonable investor could arrive at that interpretation. The concessive phrase sequential to the statement of strong expectations for the second half of the year— the caveat that "although in the third quarter, the earnings are expected to reflect the start-up costs for Reedsville"—could be read as being the one anticipated minus in what is otherwise anticipated to be an unbroken array of pluses. Moreover, the statement's reference to the firm's "record backlog" may be regarded as providing some basis for expecting a continuous stream of strong revenues. Further, the complaint points to press reports based on the press release characterizing the release as predicting continued revenue growth in the third and fourth quarters.[7] These press characterizations may be thought to lend support to the contention that this was a reasonable reading of the press release.

### 2. Implications of the Truth of an Alleged Misleading Statement

■ C–COR contends that a prediction cannot be false or misleading if it later emerges that the prediction was correct. C–COR is correct that the eventual truth of the January Press Release would defeat the plaintiffs' claims, but mistaken in believing that this is because a statement that proves true cannot have been false or misleading when made. The test of falsity is not whether a statement eventually proves true or false, but whether the speaker "genuinely and reasonably" believed it when it was made. *In re Donald J. Trump Casino Securities Lit.*, 7 F.3d 357, 368 (3rd Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994); *see also Pommer v. Medtest Corp.*, 961 F.2d 620, 623 (7th Cir. 1992) ("The securities laws approach matters from an *ex ante* perspective; just as a statement true when made does not become fraudulent because things unexpectedly go wrong, so a statement materially false when made does not become acceptable because it happens to come true."). However, "investors bringing a 'securities fraud claim cannot complain about a fraud that did not cause them any harm.'" *FMC Corp. v. Boesky*, 727 F.Supp. 1182, 1189 (N.D.Ill.1989) (quoting *Latigo Ventures v. Laventhol & Horwath*, 876 F.2d 1322, 1326 (7th Cir.1989)). The plaintiffs cannot demonstrate harm if the statements in the January Press Release later proved true.

■ It is not appropriate to decide at this stage whether the January press release's allegedly implied prediction of strong third-quarter revenues was accurate. C–COR's revenues for the third quarter of 1995 were

---

7. The complaint quotes one article, which it attributes to PR Newswire, as stating: "... C–Cor expects continued revenue growth in its fiscal year 1995 third and fourth quarters, based on a record backlog from both domestic and international ordering." Complaint, ¶ 22. The complaint also quotes a second article, from Dow Jones, as stating that C–COR "expects continued revenue growth in the third and fourth quarters of fiscal 1995, which ends June 24. In a press release, the company based its outlook on a 'record backlog from both domestic and international ordering.'" *Id.* The two articles are similar to one another, and different from the original press release, in ways that suggest that one may be based on the other, and not on the original release; thus, it is possible that this should be considered one item of evidence, rather than two.

$29,985,000, a marked improvement over its revenues in the third quarter of 1994, which were $17,828,000, but only a modest improvement over its revenues in the second quarter of 1995, which were $29,730,000.[8] There is no indication at this stage whether a reasonable investor would construe what the investor reads as a prediction of "strong" revenues to be, implicitly, making comparison to the revenues of the same quarter in the previous year, to the revenues of the previous quarter, or to the revenues for some other period. If the implied comparison is to the previous quarter, as the plaintiffs contend, it is also not clear whether an improvement of roughly one percent would qualify as "strong."[9]

### C. *Materiality of the Alleged Misleading Statement*

 A statement or omission is considered material if there is a "substantial likelihood" that it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *see also Basic, Inc. v. Levinson*, 485 U.S. 224, 232, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (finding that this standard is applicable in 10(b) and 10b–5 actions). Materiality is a mixed question of law and fact ordinarily decided by the trier of fact, *see Northway*, 426 U.S. at 450, 96 S.Ct. at 2133. However, a court may rule on questions of materiality as a matter of law "if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." *Shapiro*, 964 F.2d at 280 n. 11.

The defendants present two grounds for questioning the materiality of the statements in the January press release. First, they argue that the press release's prediction of "strong" third-quarter revenues was not ma-

terial because it constituted inactionable "puffing." Second, they assert that the securities laws do not require them to disclose "mundane operational details." Once again, I will consider these two arguments in turn.

#### 1. "Puffing"

The defendants' claim that the January press release constituted inactionable "puffing" raises the question of the precise standard applicable in determining the materiality of a prediction. A similar statement that focused on the present, rather than the future, would certainly be material. The adjective "strong" is no less specific than the adjectives at issue in *Virginia Bankshares*, in which the Court found that statements that a merger offered a "high" value at a "fair" price were material. 501 U.S. at 1094, 111 S.Ct. at 2759. Similarly, in *Shapiro v. UJB Financial Corp.*, 964 F.2d 272 (3d Cir. 1992), the Third Circuit found that statements that loan loss reserves were "adequate," "adequately maintained," "strong," and "solid" were material. *Id.* at 283. (The court did not base its finding on the large number of statements at issue, as C–COR contends, but listed a number of statements by the defendants and then found that "all of these statements" were actionable. *Id.*

██ Forward-looking statements are, however, less material than are statements of present fact. Reasonable investors know that prediction is necessarily an inexact art, and so treat forward-looking statements as less reliable than statements about present facts. Citing this principle, C–COR points to cases from the Fourth and Fifth Circuits which apply a strong presumption against the materiality of forward-looking statements. Those cases find that "projections of future performance not worded as guarantees are generally not actionable under the federal securities laws." *See Raab v. General Physics Corp.*, 4 F.3d 286, 290 (4th Cir.

---

8. *See* C–COR's Motion to Dismiss, exh. A, C. C–COR's revenues are a matter of public record, so this court can take notice of information on those revenues appearing in C–COR's pleadings but not in the complaint.

9. A prediction of "strong" revenues might also be construed to mean that the general trend of revenues over the past year is expected to continue—that is, the prediction might be read to refer, not to the absolute level of revenues, but to a continuation of the previous rate of increase in revenue levels.

1993) (quoting *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1446 (5th Cir.1993)).

The Third Circuit has not adopted a similar rule, however, and I am not persuaded that the sharp distinction that these cases seek to draw between statements about present facts and statements about future events is a tenable one. A statement like one of those at issue in *Shapiro,* a claim that loan loss reserves were "strong," is framed in terms of present facts. However, a reasonable investor would read it as expressing a relationship between present facts and future contingencies: the statement means that the reserves are thought to be adequate to meet the likely future demands upon them. Similarly, a reasonable investor, presented with a statement that a firm has a record backlog of orders, and that revenues for the coming six months are expected to be "strong," would presumably read this statement as expressing a relationship between present facts and future contingencies: she would be likely to read it as meaning that the firm has some present factual basis for believing that it will be able to transform its orders into revenues.

■ I therefore believe that a case-by-case analysis is more appropriate than the Fourth Circuit's strong presumption—expressed in *Raab, supra*—that predictions are not material. In weighing a forward-looking statement, a reasonable investor could be expected to take the statement into account to the extent that it has features that indicate that it has a reliable basis in present data, and discount it to the extent that it does not. I will not undertake to make a comprehensive list of the factors that an investor might consider in this context. However, they could include:

(1) The specificity of the prediction. Vague statements are unlikely to be seen as having a reliable factual basis, *see Shapiro,* 964 F.2d at 283 n. 12 (finding that a statement that a firm "looks to the future with great optimism" is "inactionable puffing"); *Cione v. Gorr,* 843 F.Supp. 1199, 1205 (N.D.Ohio 1994) (finding that a firm's statements that, *inter alia,* "[we] anticipate continued strong demand for tire products" and

"we're well positioned for long term growth" "simply do not have any indicia of probability and are not specific enough" to be material).

(2) How far into the future the prediction extends. Longer-term predictions are necessarily less reliable.[10]

(3) The degree to which the prediction in question is one that is inherently difficult or unreliable, as might be, for instance, a prediction as to the success of a merger.

■ An examination of these three factors suggests that this prediction is one that a reasonable investor could have found material. The prediction was somewhat vague as to the degree of success anticipated; it projected "strong" revenues, rather than providing a precise revenue figure. However, the press release did provide a concrete time frame, and mentioned that the firm had a large backlog of orders, providing some indication that the statement had a basis in fact. The prediction looked only six months (or, in the case of the implicit prediction as to the third quarter, three months) into the future, a time frame over which predictions are fairly likely to be reliable. Finally, it involved a prediction of future revenues, a relatively routine matter that is apt to be susceptible to somewhat reliable prediction. In these circumstances, I cannot find that the January Press Release constituted inactionable "puffery."

### 2. "Mundane Operational Details"

■ C–COR also asserts that, even supposing that C–COR knew of the contents of the March press release at the time of the January release, "they were under no duty to disclose such mundane operational details". In support of this proposition, C–COR cites *In re Goodyear Tire & Rubber Company Securities Litigation,* No. 88–8633, 1993 WL 130381 (E.D.Pa. Apr. 22, 1993), a case decided by my colleague Judge DuBois. In that case, Judge DuBois had before him a motion for summary judgment by the defendants; the relevant claim was a securities fraud claim based upon Goodyear's alleged failure

---

10. In *Raab,* for instance, the court found not material a prediction that was vague and that

extended "over the next several years." 4 F.3d at 286.

to reflect projected increases in its raw material costs or limitations on its production capabilities in a projection of earnings. The defendants point to Judge DuBois's comment, in the course of dismissing the plaintiffs' claims, that the plaintiffs had done "nothing more than identify issues which are properly the concern of management in the day to day operation of the corporation." *Id.* at \*9.

Read in context, it is apparent that Judge DuBois's observation is not applicable to this case. His remark was made in the course of finding that the plaintiffs had not presented evidence indicating that the earnings projections at issue had been materially false when made. *See id.* at \*9–\*10. The remark referred, therefore, to the expectation that, when a court evaluates the strength of the plaintiffs' evidence, management's evaluations of operational considerations will be entitled to some deference. At a later stage of this case, the plaintiffs will of course be required to come forward with evidence indicating that any omissions from C–COR's statements amounted to more than "mundane operational details," and in doing so they will have to overcome that deference to the assessments of management. For the present, however, they have made allegations sufficient to survive a motion to dismiss.

### III. *Federal Rule of Civil Procedure 9(b)*

The plaintiffs make conclusory allegations that the January press release was false or misleading because C–COR knew the substance of the later press release at the time that the first one was issued. Under Federal Rule of Civil Procedure 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." The defendants do not raise Rule 9(b) in their motion to dismiss; however, the court will consider on its own initiative whether the complaint meets its requirements.

The courts of appeals have differed in their interpretations of Rule 9(b). Some, like the Second Circuit, read it to require plaintiffs to allege specific facts that give rise to a "strong inference" that the defendants possessed fraudulent intent. *See, e.g., Stern v. Leucadia National Corp.,* 844 F.2d 997, 1004 (2d Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988). Others, like the Ninth Circuit, conclude that the language of Rule 9(b) imposes no duty to allege facts from which intent can be inferred, but does require the plaintiff to allege facts suggesting that the allegedly fraudulent statements were false when made. *See In re GlenFed, Inc. Securities Litigation,* 42 F.3d 1541, 1546–49 (9th Cir.1994). In a recent opinion I applied the latter standard. *See In re Valuevision International Inc. Securities Litigation,* 896 F.Supp. 434, 446 (E.D.Pa. 1995).

The plaintiffs appear to have alleged only one fact which may, if established by evidence, be thought to show that the January press release was false when issued; they allege that C–COR's chief executive officer, Perry, sold between fifteen and twenty percent of his holdings between February 16 and February 23, 1995—after the January press release and the February Form 10–Q became public and before the March press release was issued. This allegation would, if proved, tend to give rise to an inference that Perry did not believe the statements in the January press release and February Form 10–Q when they were released, suggesting in turn that they were false when made. *See In re Apple Computer Securities Litigation,* 886 F.2d 1109, 1117 (9th Cir.1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990) ("Insider trading in suspicious amounts or at suspicious times is probative of bad faith and scienter."). The trades are alleged to have occurred roughly a month after the January press release, some two weeks after the February 10–Q filing, and over a month before the March press release. Given the length of the intervals between the mid-January press release, the mid-to-late February trades, and the late March press release, this case is, at this initial pleading stage, far from being as convincing as other cases involving allegations of insider trading, in which the alleged trades occurred within days of public announcements affecting the firm's stock price. *See,*

e.g., *Lilly v. State Teachers Retirement System*, 608 F.2d 55, 56 (2d Cir.1979), *cert. denied*, 446 U.S. 939, 100 S.Ct. 2159, 64 L.Ed.2d 792 (1980) (nine-day interval between secondary offering and announcement). However, the periods involved are sufficiently brief that, at least without further explanation, they raise an inference (which is, of course, subject to rebuttal) that Perry's sales were made with the knowledge that the January press release was misleading.

Finally, it may be noted that the complaint alleges, without supporting detail, that the defendants "knew or recklessly disregarded the facts that C–COR was experiencing shortages in components, extended test times for products before they could be shipped, delays in development of products, and increased costs associated with its two new manufacturing plants." Complaint, ¶ 26. One may surmise that the complaint's failure to provide any supportive concrete allegations is traceable, at least in part, to the fact that detailed information on such matters would tend to be within the exclusive purview of management—i.e., the defendants.

Under *Shapiro v. UJB Financial Corp.*, however, to avoid dismissal, plaintiffs alleging securities fraud must "delineate at least the nature and scope of plaintiffs' effort to obtain, before filing the complaint, the information needed to plead with particularity." 964 F.2d at 285. The complaint provides no information whatsoever of this type. As *Shapiro* explains, "This requirement is intended to ensure that plaintiffs thoroughly investigate all possible sources of information, including but not limited to all publicly available relevant information, before filing a complaint." *Id.* This court's finding that the plaintiffs' allegation as to Perry's stock sales suffices to meet the requirements of Rule 9(b) does not render this requirement irrelevant: an investigation of the type contemplated by *Shapiro* might well have disclosed information tending to negate the inference arising from Perry's alleged stock sales, information which might have led them not to bring this action. The court will grant the plaintiffs leave to file an amended complaint that concisely sets forth the scope of the investigation that they have conducted

into the allegations that they make in paragraph 26 of their complaint. Because the plaintiffs may have been under the mistaken impression that their allegation as to Perry's stock sales sufficed to satisfy *Shapiro*, they will also be allowed a brief time in which to conduct such an investigation, if they have not already done so. Once an amended complaint is filed, the court will evaluate it for compliance with *Shapiro*'s requirements.

## V. *Conclusion*

The defendants also argue that, if the plaintiffs' claims against C–COR under the federal securities laws are dismissed, the plaintiffs' related claims against Perry and their claims under Pennsylvania law should suffer the same fate. Those arguments are moot, because the court has allowed the plaintiffs' federal claims against C–COR to go forward. This is, of course, with the proviso, set forth above, that the plaintiffs must file an amended complaint satisfying the requirements of *Shapiro*.

An appropriate order follows.

## ORDER

For the reasons set forth in the opinion filed herewith, it is hereby ORDERED that:

1. To the extent that the defendants' motion to dismiss seeks the dismissal of the plaintiffs' claims based upon C–COR's February Form 10–Q, that motion is GRANTED. In all other respects, the motion is DENIED.

2. The plaintiffs shall, by February 1, file an amended complaint describing their efforts to obtain the information needed to plead the material in ¶ 26 of their complaint with particularity, as discussed more fully in the accompanying opinion. Their description shall be formulated concisely and non-repetitively, and shall list in detail the sources of information that they have consulted.