MARKSMAN PARTNERS, L.P., On Behalf of Itself and All Others Similarly Situated, Plaintiff,

v.

CHANTAL PHARMACEUTICAL CORPORATION and Chantal Burnison, Defendants.

No. CV 96–0872 WJR (JRx).

United States District Court, C.D. California.

May 21, 1996.

Alan Schulman, Eric A. Isaacson, Jennifer J. Wells, Jeff S. Westerman, Milberg Weiss Bershad Hynes & Lerach, L.L.P., San Diego and Los Angeles, CA, Steve W. Berman, pro hac vice, Karl P. Barth, pro hac vice, Hagens & Berman, Seattle, WA, for plaintiff Marksman Partners, L.P.

William B. Campbell, Todd E. Gordinier, Margaret H. Gillespie, Orrick Herrington & Sutcliffe, Los Angeles, CA, Stuart A. Summit, pro hac vice, Thomas G. Jackson, pro hac vice, Jeffrey L. Shore, pro hac vice, Phillips Nizer Benjamin Krim & Ballon, L.L.P., New York City, for defendants Chantal Burnison and Chantal Pharmaceutical Corporation.

## OPINION AND ORDER

REA, District Judge.

### I.

### INTRODUCTION

The motion of defendants Chantal Pharmaceutical Corporation and Chantal Burnison to

dismiss plaintiff Marksman Partners's claims came on regularly for a hearing April 15, 1996, before the Court, the Honorable William J. Rea, District Judge, presiding. Having considered the above motion, the papers filed in support thereof and in opposition thereto, the oral argument of counsel, and the file in the case, the Court hereby issues the following decision.

## II.

## BACKGROUND

For the purposes of the instant motion to dismiss, the Court will accept the allegations of the complaint as true. *North Star International v. Arizona Corporation Commission*, 720 F.2d 578, 580 (9th Cir.1983); *In re Gupta Corp. Securities Litigation*, 900 F.Supp. 1217 (N.D.Cal.1994). Plaintiff Marksman Partners, L.P. ("Marksman"), a Washington limited partnership, through its general partner, Mark Ruljancich, purchased and sold shares of the common stock of defendant Chantal Pharmaceutical Corporation ("Chantal") between November, 1995, and January, 1996. Complaint, ¶ 9. Chantal is a Delaware corporation with principal offices in Los Angeles, California, and is primarily engaged in the business of researching, developing, and marketing various compounds for use as dermatological and skincare consumer products. *Id.* ¶ 11. Defendant Chantal Burnison ("Burnison") was Chairman of the Board, Chief Executive Officer, and Principal Financial and Accounting Officer of Chantal Pharmaceutical Corp. during periods relevant to this action. *Id.* ¶ 12. Marksman claims that the only product Chantal has marketed to date is Ethocyn, a compound designed to eliminate wrinkles and improve the appearance of aging skin, although Chantal holds patents and exclusive distribution rights for various compounds designed to treat other ailments like male pattern baldness and acne. *Id.* ¶ 11.

As of July 21, 1994, the price of Chantal common stock was at a 52–week low of $0.75

per share. *Id.* ¶ 28. Marksman alleges that Chantal was faced with "virtually non-existent revenues, rapidly eroding market capitalization, and a complete lack of funds necessary to secure FDA approval of any of its proprietary compounds." *Id.* ¶ 29. Marksman claims that, as of December 31, 1994, Burnison herself owned or controlled 1,522,103 shares of Chantal common stock, either directly or through an entity controlled by Burnison, CBD Pharmaceutical Corporation ("CBD"). *Id.* ¶ 12.

Marksman contends that Chantal and Burnison developed a plan to restore value to Chantal's common stock by reporting high sales revenues on what were essentially consignment sales of Ethocyn to a distributor.[1] According to Marksman, the defendants could then convert the value into cash by selling Chantal common stock to the public through a series of private placements and open-market transactions. *Id.* ¶ 29. The complaint alleges that Chantal and Burnison launched the plan by promoting Ethocyn with a press release showing that favorable medical studies hailed it as a "breakthrough" in skin treatment. *Id.* ¶ 30. Thereafter, Marksman contends, Chantal began to report dramatically increased revenues. *Id.* ¶ 31. By mid–1995, "certain widely-read financial analysts" began to recommend the purchase of Chantal common stock. *Id.* ¶ 32.

Marksman alleges that on July 10, 1995, Chantal issued a press release announcing that it had recently signed a marketing agreement with Stanson Marketing ("Stanson") of Los Angeles for the purchase by Stanson of specified amounts of Ethocyn from Chantal for distribution in North America. *Id.* ¶ 34. Although the terms of the agreement were not disclosed at that time, *id.*, the marketing agreement also allegedly provided that Stanson would have the right to return the product within 60 days in the event that it was unable to distribute the product successfully. *Id.* ¶ 36. Further,

---

1. A consignment sale is one in which goods are delivered by a consignor to a dealer or distributor (the consignee) primarily for sale by the consignee, and the consignee has the right to return any unsold commercial units of the goods in lieu of payment. *Malone v. Microdyne Corp.*, 26 F.3d 471, 476 n. 6 (4th Cir.1994). Because a product return cancels the sale, any sale made with the right of return creates doubt about whether the transaction actually constitutes an exchange. Dennis Kremer, *Revenue Recognition* (PLI Litig. & Admin. Practice Course Handbook Series, 1984).

Stanson had a period of 90 days to pay for any product shipped. *Id.* Marksman also claims that the terms of the marketing agreement: 1) granted Stanson an option to sell itself to Chantal anytime after December 31, 1995, for a price of twelve times Stanson's net earnings for the three months preceding exercise of the option (the "put option"); and 2) granted Chantal an option to purchase Stanson on virtually identical terms (the "call option"). *Id.* ¶ 37. Marksman contends that if the options were not exercised Chantal might still have been liable for the repurchase of any unsold goods, while if the options were exercised Chantal would effectively have to buy back any unsold inventory in the process of acquiring Stanson. *Id.*

According to Marksman, authorized accounting methods did not permit Chantal to immediately recognize sales revenues from the Stanson agreement because of the agreement's terms. The complaint alleges that Chantal recognized revenue on the sales to Stanson immediately when the products were shipped, in violation of generally accepted accounting principles ("GAAP"). *Id.* ¶ 73; Opposition, 9. This accounting recognition allegedly overstated revenues for the fiscal year ending June 30, 1995, by approximately $3,000,000 and for the quarter ending September 30, 1995, by approximately $10,000,000, and overstated receivables by at least $10,000,000 as of September 30, 1995. Complaint, ¶ 3. Marksman claims that Chantal's financial statements also violated GAAP by failing to disclose that the transaction with Stanson constituted a "related party transaction." *Id.* ¶ 77.

On July 24, 1995, *Bloomberg* News Services reported representations by Burnison that Chantal Pharmaceutical Corp. expected to report "break even" earnings for fiscal 1995, on revenues of approximately $7,000,000, which represented nearly an 8000% increase in revenues from fiscal 1994. *Id.* ¶ 38. Marksman alleges that Burnison knew, but did not disclose, that nearly 50% of the year's estimated revenues, and 90% of the estimated revenues for the final quarter of fiscal 1995, were from the Stanson sales and that Stanson's right to return the goods had not yet expired. *Id.*

As the price of Chantal stock began to rise, Marksman alleges, Chantal made a private placement of its stock. On August 8, 1995, Chantal announced the completion of a private placement of 1,000,000 shares of restricted common stock and 500,000 shares of convertible preferred stock, at a price of $4.90 per share, for a total of $7,350,000. *Id.* ¶ 44. Within a week of this announcement, Chantal's stock rose to $12.25 per share. *Id.* On September 25, 1995, the *Los Angeles Business Journal* reported that Chantal's stock price increase was being fueled mainly by the "company's stellar sales figures announced in June and an agreement signed the same month between Chantal and Stanson." *Id.* ¶ 45. On September 27, 1995, Chantal announced results for fiscal 1995 that were consistent with Burnison's July 24th estimate. *Id.* ¶ 46.

On October 27, 1995, Chantal made a formal disclosure of earnings in its 1995 Form 10–K yearly report, which was filed with the SEC on that date. *Id.* ¶ 52. According to Marksman, the Form 10–K filing revealed for the first time that about 90% of Chantal's revenues for the fourth quarter had come from Stanson, and Chantal attached a copy of the marketing agreement as one of the 22 exhibits to the 92–page Form 10–K. *Id.* ¶ 53. Marksman asserts, however, that the Form 10–K itself failed to discuss or refer to the marketing agreement, and did not disclose that revenues were allegedly being recognized in violation of GAAP. *Id.* ¶ 53.

Following the submission of the Form 10–K, Chantal continued to report earnings on its shipments to Stanson, and Chantal's stock price continued to rise. *Id.* ¶ 54. On November 14, 1995, Chantal filed its Form 10–Q quarterly report with the SEC for the quarter ending September 30, 1995. *Id.* According to the complaint, the Form 10–Q revealed that Chantal's earnings for the final quarter of 1995 had surpassed its results for the entire fiscal 1995 period, with revenues of approximately $11,000,000 and net income of nearly $4,200,000. *Id.* This allegedly represented a 56% increase in revenues and a 93% increase in net income from Chantal's reported results for all of fiscal 1995. *Id.* The complaint alleges that the Form 10–Q violated generally accepting accounting principles by reporting revenues from the sales to Stan-

son during the quarter, and did not discuss the significance of the terms of the marketing agreement. *Id.* ¶ 55.

Marksman claims to have made its first purchase of Chantal Pharmaceutical Corp. common stock beginning November 17, 1995. *Id.* ¶ 9. By December 29, 1995, the stock price had risen to $28.125 per share. Complaint, ¶ 56. On that date, Chantal filed with the SEC a Registration Statement and Prospectus that covered shares sold by Chantal in a series of private placements during fiscal 1995 and that incorporated its financial results for fiscal 1995, allegedly made in violation of GAAP. *Id.* ¶ 57. Marksman contends that at some point in December, 1995, Burnison sold 300,000 shares of her own personally-held stock at prices of over $20 per share, for net proceeds of over $6,300,-000. *Id.* ¶ 57–58.

On January 6, 1996, Chantal's well-publicized rise came to an abrupt halt. On that date, the financial journal *Barron's* published an article questioning Chantal's accounting and whether Chantal's reported revenues represented a true sale, since the risk of ownership of the products did not appear to have transferred from Chantal to Stanson. *Id.* ¶ 60–61. Two days later, on January 8, 1996, Chantal's stock lost 62% of its value, going from $19.125 to $7.31 per share on a trading volume in excess of 7,000,000 shares. *Id.* ¶ 62. Following the dramatic decline in the stock price, on January 9, 1996, Burnison announced that Chantal would retain an independent auditor to examine its accounting practices. *Id.* ¶ 64.

Marksman claims that it was the holder of 29,000 shares of Chantal stock as of January 5, 1996, acquired at an average price of approximately $21.50 per share. *Id.* ¶ 9. On January 8, 1996, following the publication of the *Barron's* article, Marksman sold all 29,-000 shares at an average price of $7.53 per share, for a claimed net loss in excess of $300,000. *Id.* On February 7, 1996, Marksman filed the instant class action complaint in federal court against Chantal Pharmaceutical Corp. and Burnison.

## III.

## DISCUSSION

Marksman has asserted claims against the defendants under section 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78j(b); Rule 10b–5 promulgated by the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5; and Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), all of which provide liability for deceptive conduct in connection with the sale of securities. *In re Worlds of Wonder Securities Litigation,* 35 F.3d 1407, 1424 (9th Cir.1994), *cert. denied sub .nom. Miller v. Pezzani,* —— U.S. ——, 116 S.Ct. 185, 133 L.Ed.2d 123 (1995); *Fecht v. Price Co.,* 70 F.3d 1078, 1080 (9th Cir. 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1422, 134 L.Ed.2d 547 (1996).

■ In order to prove a violation under Section 10(b) and Rule 10b–5, a plaintiff must show:

> (1) a misrepresentation or omission or other fraudulent device; (2) a purchase or sale of securities in connection with the fraudulent device; (3) scienter by defendant in making the misrepresentation or omission; (4) materiality of the misrepresentation or omission; 5) justifiable reliance on the fraudulent device by plaintiff (or due diligence against it); and (6) damages resulting from the fraudulent device.

*E.g., Warren v. Reserve Fund, Inc.,* 728 F.2d 741, 744 (5th Cir.), *reh'g denied,* 734 F.2d 1479 (1984).

■ Marksman's complaint does not make any allegations of specific reliance on any misrepresentations and indicates that the action is brought on a "fraud-on-the-market" theory. Complaint, ¶ 23. In a Section 10(b) and Rule 10b–5 action brought on a fraud-on-the-market theory, the plaintiff claims that he was induced to trade stock not by any particular representations made by corporate insiders, but by the artificial stock price set by the market in light of statements made by the insiders as well as other material public information. *In re Apple Computer Securities Litigation,* 886 F.2d 1109, 1114 (9th Cir. 1989), *cert. denied sub nom. Schneider v. Apple Computer, Inc.,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990); *see also Blackie v. Barrack,* 524 F.2d 891, 906 (9th Cir.

1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). The premise of the fraud-on-the-market theory, as the Supreme Court has confirmed, is that the market price of shares traded on well-developed markets reflects all publicly available information. *Basic, Inc. v. Levinson*, 485 U.S. 224, 246–47, 108 S.Ct. 978, 991–92, 99 L.Ed.2d 194 (1988).

Defendants raise three arguments in their motion to dismiss: 1) Marksman has failed to state a claim for securities fraud insofar as it has failed to allege the false or misleading material statement(s) or omission(s) on the part of defendants essential for a Section 10(b) and Rule 10b–5 violation; 2) Marksman has failed to satisfy the heightened pleading standard for scienter applicable to securities fraud actions brought under Section 10(b) and Rule 10b–5; and 3) in the absence of a cognizable Section 10(b) and Rule 10b–5 violation, Marksman has failed to state a claim against Burnison as a "controlling party" under Section 20(a) of the 1934 Act.

### A. Allegation of a Material Misrepresentation or Omission

#### 1. Rule 12(b)(6) Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may bring a motion to dismiss the plaintiff's claims on the grounds that they "fail to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). A court reviewing a Rule 12(b)(6) motion must assess whether the facts alleged, if true, would entitle plaintiff to some form of legal remedy. *De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir.1978), *cert. denied*, 441 U.S. 965, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979). Dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Department*, 901 F.2d 696, 699 (9th Cir.1988). The issue to be resolved is not whether a plaintiff's success on the merits is likely, but instead whether the plaintiff is entitled to proceed further in attempting to establish

the facts alleged. *De La Cruz*, 582 F.2d at 48.

#### 2. Misrepresentation

■■■ Marksman's complaint alleges that defendants reported earnings on the sales of Ethocyn to Stanson before such reporting was permitted under generally accepted accounting standards, which had the effect of inflating Chantal's income and artificially increasing its stock value. Generally Accepted Accounting Principles ("GAAP") are the conventions, rules, and procedures that constitute the professional standards of the accounting profession. *United States v. Arthur Young & Co.*, 465 U.S. 805, 811 n. 7, 104 S.Ct. 1495, 1500 n. 7, 79 L.Ed.2d 826 (1984). An accounting procedure that accords with a Statement of Financial Accounting Standards ("SFAS") pronouncement by the Financial Accounting Standards Board is by definition a "generally accepted accounting principle." *Franklin Savings v. Office of Thrift Supervision*, 742 F.Supp. 1089, 1125 (D.Kan.1990), *rev'd on other grounds*, 934 F.2d 1127 (10th Cir.1991); *see also* R. James Gormley, *The Law of Accountants and Auditors: Rights, Duties and Liabilities*, § 1.07(5) (1981).

■■■ Statement of Financial Accounting Standards No. 48 ("SFAS 48") provides that when an enterprise sells its products with a right of return, the seller may not recognize revenue from the sale until the right of return has expired unless "[t]he buyer acquiring the product for resale has economic substance apart from that provided by the seller."[2] Statement of Financial Accounting Standards No. 48 ¶ 6 (Fin. Accounting Standards Bd.1981) (hereinafter "SFAS 48"). In addition, SFAS 48 prohibits the immediate recognition of revenue on sales made with a right of return when the seller has no reasonable means to estimate future returns. *Id.* A company in these circumstances should not recognize any sales revenue until either: 1) the right of return has substantially expired, or 2) the company has become capable of making a

---

**2.** According to SFAS 48, this characterization applies primarily to

buyers that exist 'on paper,' that is buyers that have little or no physical facilities or employees. It prevents enterprises from recognizing sales revenue on transactions with parties that

the sellers have established primarily for the purpose of recognizing such sales revenue.

Statement of Financial Accounting Standards No. 48 ¶ 6 n. 2 (Fin. Accounting Standards Bd. 1981).

reasonable estimate of future returns, whichever first occurs. *Id.; Malone v. Microdyne Corp.,* 26 F.3d 471, 477 (4th Cir. 1994). Certain factors may impair a company's ability to make a reasonable estimate of the amount of future returns, *inter alia,* susceptibility of the product to technological obsolescence or changes in demand, relatively long right-of-return periods, and absence of historical experiences with similar types of sales of similar types of products. SFAS 48 ¶ 8.

■■■ A company's overstatement of revenues from what is essentially a consignment sale in violation of SFAS 48 can constitute a false or misleading statement of material fact necessary to establish a Section 10(b) and Rule 10b–5 violation. *Malone,* 26 F.3d at 478; *see also Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 572–76 (2d Cir.), *cert. denied,* 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982). In this case, the complaint alleges that Chantal recognized revenues on its sales to Stanson immediately, before Stanson's right of return had expired and before Chantal could make a "reasonable estimate of future returns." Complaint, ¶ 73–74. According to Marksman, Chantal could not reasonably estimate future returns on the Ethocyn sales to Stanson because: 1) Ethocyn was susceptible to a drastic drop in sales in the event that a more effective or less expensive product came on the market; 2) Stanson had a relatively long 60–day period in which to return the products; and 3) Chantal had no historical experience with sales to Stanson of Ethocyn or any other product. *Id.* ¶ 74. In addition, Marksman alleges that, as a buyer, Stanson had no "economic substance apart from" Chantal because of the put and call options in the marketing agreement. *Id.* ¶ 71–72.

Marksman's allegations fit the criteria identified in SFAS 48 for determining that a sales transaction is not appropriate for immediate revenue recognition. *See* SFAS 48 ¶ 6, 8. Defendants make no effort to contest these allegations or to rebut the contention that the immediate reporting of income was violative of SFAS 48. Assuming the allegations of the complaint are true, therefore, the immediate recognition of revenues on the sales to Stanson was improper under GAAP.[3] As a result, defendants' alleged statements relying on such accounting methods, *i.e.,* the July 24, 1995 statement regarding earnings, the September 27, 1995 statement regarding earnings, the October 27, 1995 Form 10–K, the November, 14, 1995 Form 10–Q, and the December, 29, 1995 Registration Statement and Prospectus, constituted false and misleading statements within the scope of the 1934 Act.

### 3. *Materiality*

■■■ Materially misleading statements or omissions by a defendant constitute the primary element of a Section 10(b) and Rule 10b–5 cause of action. *Basic Inc.,* 485 U.S. at 231–32, 108 S.Ct. at 983–84. A false statement or omission will be considered "material" under Section 10(b) if its disclosure would alter the "total mix" of facts available to an investor and "if there is a substantial likelihood that a reasonable shareholder would consider it important" to the investment decision. *See id.; see also Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1420 (7th Cir.1992); *Kramas v. Security Gas & Oil Inc.,* 672 F.2d 766, 769 (9th Cir.), *cert. denied,* 459 U.S. 1035, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982) (noting that the definition of materiality is the same whether misrepresentations or omissions are involved). Materiality of information in a Section 10(b) and Rule 10b–5 case is ordinarily a jury question, requiring an assessment of the inferences that a reasonable shareholder would draw

---

**3.** Marksman also alleges that Chantal's statements violated SFAS 57, which governs "related party transactions." *See* SFAS 57. According to Marksman, the buyout options between Chantal and Stanson created a "related party" situation between Chantal and Stanson, whereby "one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests." Complaint ¶ 79 (quoting SFAS No. 57 ¶ 24(e)). According to the complaint, defendants failed to make any specific disclosure that the Stanson marketing agreement constituted a "related party" transaction, as SFAS 57 requires. *Id.* ¶ 77. Because the alleged violations of SFAS 48 at issue here are sufficient to constitute the misrepresentations required for a Section 10(b) and Rule 10b–5 violation, the Court need not address the alleged violations of SFAS 57.

from a given set of facts. *Fecht*, 70 F.3d at 1080; *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985). As such, a complaint may not be properly dismissed pursuant to Rule 12(b)(6) on the grounds that the alleged misstatements or omissions are not material unless they are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman*, 754 F.2d at 1067.

 In this case, the Court simply cannot say as a matter of law that the misrepresentation alleged was not "material." Overstatement of revenues in violation of GAAP can constitute a material misrepresentation that gives rise to an action for securities fraud. *See In re Gupta Corp. Securities Litigation*, 900 F.Supp. 1217, 1231 (N.D.Cal.1994); *Malone*, 26 F.3d at 478; *Sirota*, 673 F.2d at 572–76. Given that the purpose behind such accounting rules is to protect investors by giving them a "clear and accurate picture of the position and performance of the business," *see REA Express, Inc. v. Interway Corp.*, 410 F.Supp. 192 (S.D.N.Y.), *rev'd on other grounds*, 538 F.2d 953 (2d Cir.1976), the notion that the reasonable investor would find defendants' alleged overstatements of revenues to be "material" information has intuitive force. *See S.E.C. v. Benson*, 657 F.Supp. 1122, 1131 (S.D.N.Y. 1987) (concluding that false disclosures regarding company's yearly income were material because a reasonable investor would attach importance to the information in determining his or her choice of action). The materiality of the alleged overstatements of revenues becomes especially apparent when one considers their volume: approximately $3,000,000 for the fiscal year ending June 30, 1995, and approximately $10,000,000 for the quarter ending September 30, 1995. Complaint, ¶ 3. These are not trivial amounts for a company that, according to Marksman, reported revenues of $2,813,346 for the fiscal quarter ending March 31, 1995, the first profitable quarter in its history. Complaint, ¶ 31. Further, the fact that the stock price rose dramatically while the market was receiving the alleged misstatements, and then declined dramatically after the *Barron's* arti-

cle questioned Chantal's accounting and sales reporting methods and the Chantal–Stanson relationship, and the fact that the drop in stock price prompted an immediate accounting review by Chantal support the conclusion that the false statements were "material." Ultimately, the Court can not say that the alleged misstatements of revenues here were clearly of no importance to the average investor. As a result, the complaint has sufficiently alleged the existence of material misrepresentation(s).

### 4. Was the Misrepresentation Cured by Disclosure of the Marketing Agreement?

Defendants maintain that there can be no actionable material misrepresentation or fraud in this case because the relevant information was actually disclosed to the market, in the form of the addendum of the marketing agreement to the Form 10–K. In essence, defendants believe that the disclosure of the marketing agreement as a discrete exhibit to the Form 10–K provided investors with a "complete and accurate rendering of all relevant information" concerning Chantal's financial situation. Reply, 15.

 In a fraud-on-the-market case, the misleading effect of materially false information may be cured if the accurate information is otherwise transmitted to the public. In order to avoid Section 10(b) and Rule 10b–5 liability, however, the disclosure must be made with a "degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the [defendants'] one-sided representations." *In re Apple Computer*, 886 F.2d at 1116. If both the "true" and the "false" information are transmitted to the market with "roughly equal intensity and credibility," then the market will be presumed to have received complete and accurate information. *Id.* at 1114. The Court must therefore assess whether defendants' disclosure of the marketing agreement in the Form 10–K was sufficient to counteract the allegedly misleading appraisals of Chantal's revenues conveyed by its financial statements and public announcements.[4]

4. As an initial matter, a statement in the Form 10–K highlighted by defendants that there was a

potential "concentration of credit risk" with respect to receivables owed by Stanson does not

■ The Court is unpersuaded that defendants' appendix of the marketing agreement to the Form 10–K constituted a disclosure of adverse information sufficient to neutralize the allegedly misleading effect of defendants' accounting statements. First, the Court is not inclined to accept defendants' assumption that the manner in which the addendum was disclosed was sufficient to apprise investors of the information contained therein. As Marksman notes, the marketing agreement was attached as one of 22 exhibits to the 92–page Form 10–K. Complaint, ¶ 53. Marksman points out that nothing in the body of the Form 10–K discussed the marketing agreement, explained the significance of its terms, or disclosed that revenues were being recognized while Stanson had a right of return or before Stanson was actually obligated to make payment. Complaint, ¶ 53. The Court is reluctant to rule that no reasonable investor could have been misled by this manner of disclosure.[5] *Cf. Spielman v. General Host Corp.*, 538 F.2d 39, 40 n. 2 (2d Cir.1976) (noting that the district court could not rule as a matter of law that an express disclosure in an appendix to a prospectus cured a misleading impression conveyed in the body of the prospectus).

Further, defendants' contention that the addendum disclosure in the Form 10–K was sufficient to put the market on notice of the accounting methods used and their potential impropriety is unaccompanied by any plausible explanation of how a reasonable investor could draw such a conclusion. *Cf. Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083,

1097, 111 S.Ct. 2749, 2760–61, 115 L.Ed.2d 929 (1991) (noting that the purpose of a proxy statement issued to shareholders is "to inform, not to challenge the reader's critical wits"). The complaint, for its part, alleges that defendants' audited financial statements in the Form 10–K failed to discuss the marketing agreement, its terms, or the fact that a substantial amount of revenues recognized before the end of the fiscal year were derived from it. Complaint, ¶ 53.

The Court cannot agree with defendants that the release of an inconspicuous addendum renders misleading financial and other public statements presumptively consistent with the strictures of Section 10(b) and Rule 10b–5, especially where it is unclear that the contents of the addendum directly address the allegedly misleading information in the statements. *See Virginia Bankshares*, 501 U.S. at 1097, 111 S.Ct. at 2760–61 (stating that "a misleading statement will not always lose its deceptive edge simply by joinder with others that are true"). To immunize the type of conduct alleged here would be to give companies a license to issue groundless appraisals to investors so long as they include a modest footnote or appendix with a kernel of truth that might enable an analyst or accountant to spot the inconsistencies.[6] *See S.E.C. v. Rana Research, Inc.*, 8 F.3d 1358, 1362–63 (9th Cir.1993) (holding that curative press releases containing a "grain of truth" did not prevent deception of the market due to previous misrepresentations); *cf. Virginia Bankshares*, 501 U.S. at 1097, 111 S.Ct. at 2760–61 (stating that "[i]f it would take a financial

seem to be the type of unequivocal cautionary statement that would normally suffice to render the disclosure not misleading. It did not address the manner of accounting used or the terms of the agreement but merely referred to the likelihood of payment by Stanson. *See In re Worlds of Wonder*, 35 F.3d at 1424–25 (noting that "detailed" risk disclosure in a prospectus may rebut an inference of fraudulent intent); *Fecht*, 70 F.3d at 1082 (stating that "[i]nclusion of *some* cautionary language is not enough to support a determination as a matter of law that [a defendant's] statements were not misleading").

5. Under SEC regulations, for example, a material deviation from GAAP on the face of financial statements will be presumed to be misleading despite footnotes or other disclosures to the statements. 17 C.F.R. § 210.4–01(a)(1).

6. It is true that a defendant may sometimes be able to rebut the presumption of reliance in a fraud-on-the-market action under Section 10(b) and Rule 10b–5 by showing that sophisticated buyers, or "market makers," were not taken in by the misrepresentations at issue. *Cione v. Gorr*, 843 F.Supp. 1199, 1202 (N.D.Ohio 1994). Defendants have not attempted to make any such showing here, however, and the relevance of such a showing in any event would necessarily depend on a finding that the manner of disclosure was presumptively sufficient to alert investors to the contents of the disclosure, a finding that the Court does not make. Further, the "market maker" perspective has no bearing on the question of materiality, which is based instead on the perspective of a "reasonable investor." *Id.*

analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow"); *Gerstle v. Gamble–Skogmo, Inc.,* 478 F.2d 1281, 1297 (2d Cir.1973) (stating that "it is not sufficient that overtones might have been picked up by the sensitive antennae of investment analysts"); *cf. Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 603 (5th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974) (noting that "burying the facts, or giving them less than significant emphasis" in a proxy statement can deprive shareholders of "full and honest disclosure"). The Court is unable to find, therefore, that the material information was transmitted with a degree of "intensity and credibility" sufficient to render defendants' overstatement of revenues not misleading as a matter of law. *See In re Apple Computer,* 886 F.2d at 1114–16.

Because the Court concludes that Marksman has alleged facts sufficient to allow reasonable minds to disagree about whether the statements made here were misleading, dismissal is not warranted on the grounds that Marksman has failed to allege a material misrepresentation or omission.

**B.** *Has Scienter Been Adequately Pled?*

**1.** *Rule 9(b) Requirements*

 Under Federal Rule of Civil Procedure 9(b), in a securities fraud action, a pleading is sufficient if it identifies the circumstances of the alleged fraud so that the defendant can prepare an adequate answer.[7] *Fecht,* 70 F.3d at 1082. The notice requirement is satisfied by allegations of the "time, place and nature of the alleged fraudulent activities." *Id.* (quoting *Walling v. Beverly Enterprises,* 476 F.2d 393, 397 (9th Cir. 1973)). When a fraudulent statement is alleged, the plaintiff must "set forth what is false or misleading about [the] statement, and why it is false." *In re GlenFed, Inc. Securities Litigation,* 42 F.3d 1541, 1548 (9th Cir.1994).

Although defendants' motion is ostensibly brought, in part, under Rule 9(b), defendants do not specifically argue that the complaint falls short of the requirements of Rule 9(b) itself. In any event, the Court is satisfied that the complaint highlights in sufficient detail the precise dates, manner, content, and nature of the statements alleged to be fraudulent or misleading. *See, e.g., Ross v. A.H. Robins Co.,* 607 F.2d 545, 558 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980) (finding that complaint satisfied Rule 9(b) by referring to specific dated documents, *i.e.,* the Form 10–K, press releases, and annual reports, alleged to be misleading). As a result, the Court finds no basis to dismiss the complaint under Rule 9(b).

**2.** *The Private Securities Litigation Reform Act's Heightened Pleading Standard*

As defendants point out, under the very recent Private Securities Litigation Reform Act of 1995 ("PSLRA"), Public Law 104–67 (codified at 15 U.S.C. § 78u–4 (1995)), which amends the Securities Exchange Act of 1934,[8] the pleading standard in securities fraud cases has been made more rigorous, beyond mere Rule 9(b) requirements. A complaint alleging securities fraud must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all the facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1), Pub.L. No. 104–67 § 21D(b)(1). Moreover, in order to sufficiently allege scienter the complaint must now "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u–4(b)(2), Pub.L. No. 104–67 § 21D(b)(2). If the complaint fails to do so, dismissal is required. 15 U.S.C. § 78u–4(b)(3)(A), Pub.L. No. 104–67 § 21D(b)(3)(A).

---

**7.** Rule 9(b) states that
[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed.R.Civ.P. 9(b).

**8.** Congress passed the PSLRA on December 22, 1995.

Defendants' contention with regard to the PSLRA's new pleading standard is that Marksman has failed to adequately plead "scienter," which is the state of mind required for a Section 10(b) and Rule 10b–5 violation. Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668, *reh'g denied*, 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976). Recklessness can constitute scienter under Section 10(b).[9] *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569–70 (9th Cir.1990), *cert. denied*, 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991); *Sirota*, 673 F.2d at 575. Recklessness involves not merely simple or inexcusable negligence, but an "extreme departure from the standards of ordinary care ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Software Toolworks, Inc.*, 50 F.3d 615, 626 (9th Cir.

1994), *cert. denied sub nom. Montgomery Securities v. Dannenberg*, —— U.S. ——, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995). The proof of scienter in fraud cases is often a matter of inference from circumstantial evidence. *Id.* at 627; *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n. 30, 103 S.Ct. 683, 692 n. 30, 74 L.Ed.2d 548 (1983).

Under pre-PSLRA Ninth Circuit authority, a plaintiff could plead scienter with conclusory allegations so long as the complaint set forth the circumstances indicating the fraudulent nature of the statements. *GlenFed*, 42 F.3d at 1548–49; *Fecht*, 70 F.3d at 1082 n. 4 (noting that under the *GlenFed* standard, a plaintiff need "simply ... say[ ] that scienter existed" to satisfy Rule 9(b)). The PSLRA leaves little doubt, however, that the lenient *GlenFed* standard can no longer be said to constitute the sum of scienter pleading requirements in a Section 10(b) and Rule 10b–5 case. Under a more stringent standard employed by the Second Circuit, a

---

9. Defendants propose, without substantial argument, that the PSLRA has abolished securities fraud liability for merely reckless conduct. The Court does not agree. First, defendants' suggestion that strengthening the pleading standard for scienter must necessarily result in a change to the nature of the scienter required makes little sense. Second, while it is true that the PSLRA elevates the mental state requirement to "actual knowledge" for certain specified situations, the Court finds no basis to conclude that Congress altered the mental state requirement for the type of Section 10(b) and Rule 10b–5 violation at issue in this case.

First, although the PSLRA provides a "safe harbor" for certain "forward-looking statements," requiring that a plaintiff must prove actual knowledge of falsity in order to establish liability for such statements, 15 U.S.C. § 77z–2, Pub.L. No. 104–67, § 21E(c), the misrepresentations alleged in this case, with the possible exception of Burnison's July 24, 1995 statement, do not fall within the category of "forward-looking statements." Second, the PSLRA's provision that joint and several liability may only be imposed on a person who "knowingly committed" a violation of the securities laws is expressly limited so as not to "create, affect, or in any manner modify, the *standard for liability* associated with any action arising under the securities laws." 15 U.S.C. § 78u–4(g)(1)–(10) (emphasis added).

The legislative history of the PSLRA does not indicate that Congress acted to eliminate recklessness as a basis for scienter in actions like the instant one. The version of the bill originally adopted by the House expressly provided for liability based on reckless conduct, *see* H.R. 1058, 104th Cong., 1st Sess. (1995), U.S.Code Cong. & Admin.News 1995 at 679, and contained a definition of recklessness based largely on the Seventh Circuit's decision in *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044–45 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977). John W. Avery, *Securities Litigation Reform: The Long and Winding Road to the Private Securities Litigation Reform Act of 1995*, 51 Bus. Law 335, 337, 369–371 (1996). The drafters of the final version of the PSLRA ultimately chose not to include a recklessness standard and inserted only one explicit reference to "reckless conduct," in the Act's section on proportionate liability. 15 U.S.C. § 78u–4(g)(10)(B). The Conference Committee report, however, suggests that Congress did not intend to change the state of mind requirements of existing law, H.R. Conf.Rep. 104–369, 38, U.S.Code Cong. & Admin.News at 737, and this is confirmed by the absence of any express abrogation in the PSLRA of recklessness liability for the type of conduct at issue here.

Admittedly, the text and legislative history of the PSLRA indicate some ambivalence on the part of Congress regarding recklessness liability in securities fraud cases. At least one commentator has observed that Congress appears to have "studiously avoided" the question, preferring instead to leave it to judicial resolution. Avery, *Securities Litigation Reform*, 51 Bus. Law at 337, 369–371. Legislative silence, however, does not give the Court grounds to conclude that recklessness is no longer an adequate basis to establish scienter for the violation alleged here.

**1310**

plaintiff pleading scienter can do so by alleging either: 1) a "motive" and an "opportunity" on the part of the defendant(s) to commit fraud; or 2) facts that constitute strong circumstantial evidence of conscious behavior or recklessness. *E.g., Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994); *Glickman v. Alexander & Alexander Services, Inc.*, 1996 WL 88570, *5 (S.D.N.Y. 1996). It is to this standard that the Court now turns.

### a. The "Motive and Opportunity" Test

Defendants argue that the PSLRA has rejected the Second Circuit's "motive and opportunity" test for pleading scienter along with more lenient standards like the *GlenFed* rule. Defendants contend that "Congress necessarily had to eliminate the 'motive and opportunity' analysis if it wanted to strengthen the standard for pleading scienter." Reply, 5. Defendants make the argument that the "motive and opportunity" test would subject every corporate defendant to securities fraud actions every time there is a downturn in stock value, since every corporate issuer of a security that is the subject of a claimed misstatement has the "opportunity" to make the misstatement and a "motive" to sell its stock at a higher price. *Id.*

Although defendants cite no recent cases to support their contention,[10] and the body of the PSLRA contains no references to the "motive and opportunity" test, defendants point to the legislative history of the statute. In its Conference Report, the conference committee emphasized that it was strengthening existing pleading requirements, and therefore did not intend to codify the Second Circuit's case law interpreting the scienter pleading standard. H.R. Conf. Rep. 104–369, 104th Cong., 1st Sess., 41 (1995), U.S.Code Cong. & Admin.News at 740.

The Court confronts an issue of first impression, given the very recent passage of the PSLRA, and thus finds itself compelled to resolve the issue without the aid of any pronouncements from sister courts. Ulti-mately, however, the Court believes that the "motive and opportunity" test has not been discarded. Notwithstanding defendants' citation to the legislative history, a number of considerations militate against their argument.

First, the conference committee emphasized that the Second Circuit's pleading standards were the most stringent of any circuit's, and thus it is reasonable to assume that Second Circuit jurisprudence comes closest to approximating the PSLRA's new requirements. *See id.* It is worthy of note that the language used by the PSLRA to articulate its scienter pleading standard, *i.e.*, "strong inference," mirrors language traditionally employed by the Second Circuit in its application of Rule 9(b) to scienter pleadings. *E.g., Shields*, 25 F.3d at 1128; *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993). Second, it does not appear that the test as applied is susceptible to the results that defendants fear. Courts applying the "motive and opportunity" test have noted that "[a]llegations of motive that are generally held by similarly positioned executives and companies [e.g., to improve the company's financial health or reputation] are insufficient to sustain a claim under the securities laws." *Glickman*, 1996 WL 88570, *6 (quoting *Grossman v. Texas Commerce Bancshares, Inc.*, 1995 WL 552744 (S.D.N.Y.1995)); *see also In re Crystal Brands Securities Litigation*, 862 F.Supp. 745, 749 (D.Conn.1994) (holding that alleged motives of directors and officers to maintain good relations with suppliers, retailers and lenders and to protect their positions are insufficient because they "pertain to virtually any company that manufactures goods"). The "generic motive" of increasing capital is not enough, and the complaint must allege circumstances giving rise to a strong inference that the defendants knew the statements to be false. *Glickman*, 1996 WL 88570, *11. Thus, the "motive and opportunity" test appears to be consistent with Congress's intent that scienter be pled

---

**10.** The Court notes that at least two of the cases proffered by defendants, *Glickman v. Alexander & Alexander Services, Inc.*, 1996 WL 88570 (S.D.N.Y.1996), and *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015 (5th Cir.1996), decided soon after the passage of the PSLRA, applied the Second Circuit "motive and opportunity" test. This may very well be, however, because the PSLRA by its very terms does not apply to cases filed before its passage. Pub.L. No. 104–67, § 108; *In re Numerex Corp. Securities Litigation*, 913 F.Supp. 391, 396 n. 9 (E.D.Pa.1996).

with more than conclusory or generic allegations. *See Shields*, 25 F.3d at 1128 (stating that a complaint may not base claims of fraudulent intent on "speculation and conclusory allegations").

The Court is unimpressed with defendants' enthusiastic reliance on an oblique reference to "motive, opportunity and recklessness" in a footnote to the Conference Committee Report for their argument that the "motive and opportunity" test has been jettisoned.[11] The footnote, embedded as it is in the legislative history and not the body of the statute, implies that Congress chose not to codify motive and opportunity as pleading requirements but does not indicate that Congress chose to specifically disapprove the motive and opportunity test. The Court has little doubt that when Congress wishes to supplant a judicially-created rule it knows how to do so explicitly, and in the body of the statute. *See* 42 U.S.C. § 2000bb(a)–(b) (Religious Freedom Restoration Act's ("RFRA") declaration of purpose); *Muslim v. Frame*, 891 F.Supp. 226, 228 (E.D.Pa.1995) (noting Congress's passage of RFRA, 42 U.S.C. § 2000bb, which explicitly rejected the Supreme Court's "reasonableness" test for free exercise of religion claims and reinstated its earlier "compelling interest" test).

Moreover, the "motive and opportunity" test does not appear to present a barrier to the achievement of Congress's clear purpose of making scienter allegations more difficult to plead. The test itself is an exacting analysis courts have employed to assess whether the quantum and quality of factual allegations in the complaint, *beyond* mere allegations that a material misrepresentation occurred, actually create an inference that a defendant acted with an intent to defraud. There is no reason to assume that the PSLRA's requirement that the inference now be a "strong" one is inconsistent with the test's analytic framework for sifting through factual allegations. *See* H.R.Conf.Rep. 104–369, 41, U.S.Code Cong. & Admin.News at 740 (noting that Congress intended to

strengthen *existing* pleading requirements). On the contrary, the fact that Second Circuit courts applying the "motive and opportunity" test have traditionally done so with the express recognition that the plaintiff's allegations must yield a "strong" inference of fraudulent intent supports the conclusion that the test is wholly consistent with the PSLRA's standard. *E.g., Shields*, 25 F.3d at 1128; *Baxter v. A.R. Baron & Co.*, 1995 WL 600720, *2 (S.D.N.Y.1995).

In this regard, the Court finds instructive a portion of the legislative history not referred to by defendants. In its report on the passage of the PSLRA, the Senate Banking, Housing, and Urban Affairs Committee articulated its position that the new pleading standard is derivative of prior Second Circuit jurisprudence in securities fraud cases:

> The Committee does not adopt a new and untested pleading standard that would generate additional litigation. Instead, the Committee chose a uniform standard modelled upon the pleading standard of the Second Circuit. Regarded as the most stringent pleading standard, the Second Circuit requires that the plaintiff plead facts that give rise to a "strong inference" of defendant's fraudulent intent. The Committee does not intend to codify the Second Circuit's caselaw interpreting this pleading standard, although courts may find this body of law instructive.

S.Rep. No. 98, 104th Cong., 1st Sess., 15 (1995), U.S.Code Cong. & Admin.News at 694. The Conference Committee report confirms this understanding of the Act's derivative nature. H.R. Conf. Rep. 104–369, 41, U.S.Code Cong. & Admin.News at 740 (stating that "[t]he Conference Committee language is based in part on the pleading standard of the Second Circuit").

On balance, therefore, the Court finds itself unpersuaded by defendants' interpretation of the PSLRA. As the discussion above makes clear, there is no basis to conclude that Congress eradicated, *sub silentio*, the

11. The text accompanying the footnote states that "[b]ecause the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard," and the footnote itself states that "[f]or this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness." H.R. Conf. Rep. 104–369, 41 & n. 23, U.S.Code Cong. & Admin.News at 740 & n. 23.

well-established "motive and opportunity" test for examining scienter pleadings in Section 10(b) and Rule 10b–5 cases. Because Second Circuit jurisprudence in the area of securities fraud claims is wholly consistent with both the language and purpose of the PSLRA, the Court finds the "motive and opportunity" test to be a suitable standard to employ in this case.

### b. Marksman Has Successfully Pled Motive and Opportunity

Marksman contends that Burnison and Chantal engaged in deceptive conduct in order to: 1) enhance the value of Chantal stock; 2) complete a substantial private placement of Chantal common stock; 3) protect and enhance Burnison's executive position and the compensation and prestige she held thereby; and 4) sell a substantial portion of Burnison's stock holdings at artificially inflated prices. Complaint, ¶ 15. There is no question about Chantal and Burnison's "opportunity" to carry out the means, i.e., misrepresentations about Chantal's financial performance to the public, necessary to accomplish these benefits. See Shields, 25 F.3d at 1130 (defining opportunity as the "means and likely prospect of achieving concrete benefits by the means alleged"). Chantal and Burnison exercised control over the issuance of accounting and financial statements for Chantal Pharmaceutical Corp. during the relevant periods, and had direct access to information concerning Chantal's financial conditions and operations.[12] See Cohen v. Koenig, 25 F.3d 1168, 1173–74 (2d Cir.1994) (finding "opportunity" to commit fraud where defendants were officers, directors, and majority shareholders fully familiar with operations of the company).

■ The "motive" prong is a little less clear, however. Substantial authority exists to indicate that the first three of Marksman's alleged "motives" are insufficient in themselves to sustain a strong inference of intent to defraud. In Acito v. IMCERA Group, Inc., 47 F.3d 47 (2d Cir.1995), the court held that allegations that corporate insiders were motivated to defraud the public to achieve an inflated stock price or to increase executive

compensation were insufficient to prevent dismissal under Rule 9(b) and Rule 12(b)(6). Id. at 53–54. The Court noted that to allow a plaintiff to plead scienter on such a basis alone would force "virtually every company in the United States that experiences a downturn in stock price" to defend securities fraud actions. Id. at 54. Here, Marksman's allegations that misrepresentations were made to increase Chantal's stock value, which would facilitate sales of the corporation's stock and increase executive compensation cannot, with more, establish scienter. See Glickman, 1996 WL 88570, *11 ("generic motive" of increasing capital not enough for scienter); In re Gupta Corp., 900 F.Supp. at 1231; Shields, 25 F.3d at 1130 (stating that motive entails false statements and wrongful nondisclosures aimed at achieving "concrete benefits").

■ The last "motive" allegation made by Marksman, however, is sufficient to constitute a basis for the scienter element of a Section 10(b) and Rule 10b–5 claim. Allegations that a corporate insider either presented materially false information, or delayed disclosing materially adverse information, in order to sell personally-held stock at a huge profit can supply the requisite "motive" for a scienter allegation. See Acito, 47 F.3d at 54; In re Gupta Corp., 900 F.Supp. at 1231. Thus, insider trading activity during the class period may support a strong inference of scienter. Acito, 47 F.3d at 54; In re Apple Computer, 886 F.2d at 1117. A plaintiff, however, must demonstrate that the insider trading activity was "unusual," Acito, 47 F.3d at 54, which requires a showing that the trading was "in amounts dramatically out of line with prior trading practices, at times calculated to maximize personal benefit from undisclosed inside information.". Alfus v. Pyramid Technology Corp., 764 F.Supp. 598, 605 & n. 1 (N.D.Cal.1991) (citing In re Apple Computer, 886 F.2d at 1117)).

Where a corporate insider sells only a small fraction of his or her shares in the corporation, the inference of scienter is weakened. Acito, 47 F.3d at 54. In this

---

12. According to the complaint, the public statements at issue were made by Burnison, and at least two of the allegedly misleading financial

statements were signed personally by Burnison. Complaint, ¶ 53–54.

case, Marksman alleges that Burnison sold 300,000 shares of her own stock at prices of over $20 per share, for net proceeds of over $6,300,000 in December, 1995. Complaint, ¶ 58–59. Marksman concedes that this amount represented only twenty percent of Burnison's holdings. *Id.* ¶ 12. Marksman alleges, however, that the sale was highly unusual, in that Burnison had not sold any of her Chantal stock in the previous three years. *Id.*

Twenty percent of a corporate insider's shares, especially where the dollar amounts involved are high, may constitute a "suspicious amount" sufficient to support a scienter allegation. *See Alfus,* 764 F.Supp. at 605; *In re Gupta Corp.,* 900 F.Supp. at 1231–32; *McCarthy v. C–COR Electronics, Inc.,* 909 F.Supp. 970, 978–79 (E.D.Pa.1995); *In re Apple Computer,* 886 F.2d at 1117. In this case, Burnison's volume of traded stocks, in excess of $6,300,000, and the percentage of her holdings sold support an allegation of motive. *See In re Gupta Corp.,* 900 F.Supp. at 1231–32 (holding that sales of corporate stock by six individual defendants for a total of approximately $4,200,000 were sufficient to support inference of scienter against them under pre-PSLRA pleading standard). In addition, the alleged "motive" is strengthened by the facts that Burnison sold her shares while the market was still receiving allegedly misleading revenue information, and that she had not made any such sales in the previous three years.

The allegations of the complaint establish, therefore, that defendants had both the "opportunity" and the "motive" to issue materially fraudulent statements to investors regarding Chantal's financial performance. The complaint's theory of "motive" and "opportunity" is consistent with the relevant events alleged, *i.e.,* the defendants' extreme overstatement of revenues on the only product marketed by Chantal, the unprecedented rise in Chantal's stock value, and Burnison's subsequent large-volume insider trading. As a result, the Court finds that Marksman has sufficiently pled facts giving rise to a "strong inference" of scienter under the "motive and opportunity" test.

### c. Strong Circumstantial Evidence of Conscious Behavior or Recklessness

Even assuming, *arguendo,* that the "motive and opportunity" test does not yield the requisite "strong inference," Marksman may still successfully plead a strong inference of scienter under the Second Circuit's "circumstantial evidence" test. *Glickman,* 1996 WL 88570, 14 (stating that "[a]s an alternative to alleging facts to show a defendant had both motive and opportunity to commit fraud, a complaint may allege facts that constitute 'strong circumstantial evidence of conscious misbehavior or recklessness' "). Defendants do not argue that this test is inapplicable or disapproved under the PSLRA, and the Court's discussion, *supra,* regarding the consistency between Second Circuit jurisprudence and the PSLRA's explicitly-articulated standards provides support for its application here.

If the "circumstantial evidence" method is used, the strength of the circumstantial allegations must be correspondingly greater. *Id.* (citing *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir. 1987)). Here, the circumstantial allegations of the complaint do support a strong inference that defendants acted with an intent to defraud the market. A violation of Generally Accepted Accounting Principles ("GAAP") may be used to show that a company overstated its income, which may be used to show the scienter for a violation of Section 10(b) and Rule 10b–5. *See Wechsler v. Steinberg,* 733 F.2d 1054, 1058–59 (2d Cir.1984). Specifically, an accounting violation of SFAS 48 can constitute one basis for a finding of scienter. *Malone,* 26 F.3d at 478–79. Although it is true that a violation of GAAP in itself will generally not be sufficient to establish fraud, *In re Software,* 50 F.3d at 627, when combined with other circumstances suggesting fraudulent intent, however, allegations of improper accounting may support a strong inference of scienter. *See In re Chambers Development Securities Litigation,* 848 F.Supp. 602 (W.D.Pa.1994). In addition, where accounting disclosures are made "without a genuine belief or reasonable basis, are made knowingly or recklessly and

**1314**

are inaccurate, they constitute culpable conduct actionable under Section 10(b) and Rule 10b–5." *In re Westinghouse Securities Litigation,* 832 F.Supp. 948, 970 (W.D.Pa.1993) (internal quotations and citations omitted).

■ As stated above, defendants here controlled and approved the issuance of accounting and financial statements for Chantal Pharmaceutical Corp. during the relevant periods, and had direct access to information concerning Chantal's financial conditions and operations. According to the complaint, Chantal's July 24, 1995 and September 27, 1995 statements about earnings, the recorded sales for the final quarter of fiscal 1995 contained in the Form 10–K statement, the November 14, 1995 Form 10–Q, and the December 29, 1995 Registration Statement and Prospectus were all materially false and misleading in that they relied in large part on earnings assessments made in violation of SFAS 48. According to the complaint, the earnings assessments derived from the Stanson agreement constituted a significant share of Chantal's total earnings for the last quarter of 1995. The facts that the allegedly overstated revenues constituted such a significant portion of Chantal's total revenues and that the allegedly misleading financial and other public statements bore defendants' imprimatur tend to support the conclusion that the defendants acted with scienter. In addition, the allegations that Burnison divested herself of a substantial portion of her shares at a considerable profit and that Chantal completed a substantial private placement of its stock following the rise in Chantal's stock value, which was allegedly precipitated by the fraudulent disclosures, strongly support the conclusion that defendants' misstatements of revenues and earnings were made with either a specific or reckless intent to defraud.[13]

Defendants pose an argument that they believe negates the inference from the circumstances alleged: they contend that Burnison's actions in the overall sequence of events do not support a strong inference of fraudulent intent because she sold her shares *after* disclosure of the terms of the marketing agreement. *See, e.g., Ferber v. Travelers Corp.,* 802 F.Supp. 698, 714 (D.Conn.1992) ("defendants' provision of adverse information to the public by way of disclosures negates an inference that they acted with an inten[t] to defraud") (quotation omitted). In the typical insider trading situation, the corporate insider profitably sells his or her own stock holdings in the company *before* adverse information becomes public. *See In re Apple Computer,* 886 F.2d at 1117–19; *see also, Lilly v. State Teachers Retirement System,* 608 F.2d 55, 56 (2d Cir.1979), *cert. denied,* 446 U.S. 939, 100 S.Ct. 2159, 64 L.Ed.2d 792 (1980) (sale of 80,000 shares nine days prior to public announcement that "problem loans" had increased from $7,000,000 to $16,000,000); *Jefferies & Co. v. Arkus–Duntov,* 357 F.Supp. 1206 (S.D.N.Y.1973) (sale of 40,000 shares two days before the SEC suspended trading in the stock). Here, Burnison sold her own stock in the corporation some time *after* the information in the Form 10–K became public.

Even assuming, *arguendo,* that the manner in which defendants disclosed the marketing agreement was presumptively sufficient to put investors on notice of its terms (a conclusion that the Court does not accept, *supra* ), defendants' argument still lacks merit. The Court has no basis to conclude that the marketing agreement itself explained the manner in which Chantal would recognize revenues on the sales to Stanson. In addition, neither the Form 10–K nor the audited financial statements released by defendants discussed the existence of the marketing agreement or the fact that the agreement covered revenues recorded and recognized prior to the end of the fiscal year. Complaint, ¶ 53. As a result, defendants' disclosure of the agreement does not support the conclusion that they intended to dispel the allegedly misleading effect of the financial statements. It also, therefore, does not negate the inference that defendants made the material misstatements with either a specific or reckless intent to defraud.

13. The fact that Chantal's independent auditor may have approved the accounting methods will not shield Chantal from liability for deception such methods may have caused. *See In re Chambers,* 848 F.Supp. at 611–13, 619–621.

As stated above, the complaint alleges that Chantal's method of revenue recognition was inconsistent with SFAS 48. Premature accounting recognition of this kind by corporate defendants, where a right of return is clearly capable of exercise, permits an inference of scienter.[14] *See Malone,* 26 F.3d at 478–480 (holding that jury could make inference that corporate defendants' false or misleading statements regarding sales, which violated SFAS 48, were made with an intent to deceive, manipulate, or defraud investors based on evidence that defendants were aware of the right of return and approved it). When considered in light of the other allegations in this case, *inter alia,* the significant extent to which revenues were allegedly overstated, Burnison's substantial and unusual insider sales, and Chantal's large private placement of stock, the inference drawn becomes a strong one.

Although the Court is not in a position to determine on the instant motion that defendants' conduct did indeed constitute a Section 10(b) and Rule 10b–5 violation, the circumstances alleged by plaintiff are certainly sufficient to allow a strong inference either that defendants were acting with a specifically deceptive and manipulative intent, or at least that their conduct constituted such an extreme departure from the standards of ordinary care regarding the danger of misleading investors as to constitute recklessness. Taking Marksman's particularized factual allegations as true, the Court finds that the complaint successfully creates a "strong inference" of scienter. Dismissal is therefore not warranted.

### C. *Controlling Person Liability*

■ Section 20(a) of the 1934 Securities Act imposes joint and several liability on any "person who, directly or indirectly, controls any person liable" for securities fraud under the Act, "unless the controlling person acted in good faith and did not directly or indirectly induce" the violations. 15 U.S.C. § 78t(a); *In re Gupta Corp.,* 900 F.Supp. at 1242. A plaintiff must assert that the individual defendant had the "power to control or influ-

ence" the defendant corporation in order to state a cognizable claim under Section 20(a). *In re Gupta Corp.,* 900 F.Supp. at 1242; *see also Gray v. First Winthrop Corp.,* 776 F.Supp. 504, 510 (N.D.Cal.1991).

Defendants' motion to dismiss the claim for "controlling person" liability against Burnison under Section 20(a) of the 1934 Act is brought under Rule 12(b)(6), on the sole basis that there can be no Section 20(a) liability where a plaintiff has failed to state a claim under Section 10(b) and Rule 10b–5. Motion, 16. As the Court's decision above is that Marksman has sufficiently stated such a claim, this is not a valid basis for dismissal. In addition, the Court is satisfied that the complaint has sufficiently stated a claim for controlling person liability. Marksman's claim is made against Chantal Burnison in her capacity as Chairman of the Board, Chief Executive Officer, and Principal Financial and Accounting Officer of Chantal Pharmaceutical Corp. Complaint, ¶ 87. Marksman's complaint adequately alleges Burnison's "actual participation in the corporation's operation [and] influence" such that the consequences of control may be imposed. *See Burgess v. Premier Corp.,* 727 F.2d 826, 832 (9th Cir.1984). As a result, defendants have not presented an adequate basis for a grant of this portion of their motion.

### D. *Motion for Certification*

On April 19, 1996, shortly after the motion to dismiss came on for hearing, defendants moved for certification of the Court's order of decision for interlocutory appeal under 28 U.S.C. § 1292(b). The Court finds that the hereinabove order involves a "controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); *see Goodyear Tire & Rubber v. McDonnell Douglas Corp.,* 820 F.Supp. 503, 512 (C.D.Cal.1992). As a result, the Court grants defendants' motion for certification.

---

14. Although not perfectly coextensive, the Financial Accounting Standards of GAAP and the antifraud rules promulgated pursuant to § 10(b) of the 1934 Securities Act serve similar purposes, and some courts have treated violations of the former as indicative that the latter were also violated. *Malone,* 26 F.3d at 478.

## IV.

## CONCLUSION

For the foregoing reasons, it is the Court's decision that defendants' motion to dismiss be denied in its entirety. Defendants' motion for certification is hereby granted.

IT IS SO ORDERED.